Andover Housing Authority v. Shkolnik.

ANDOVER HOUSING AUTHORITY vs. IZRAIL SHKOLNIK
& another.[1]

Essex. November 2, 2004. - January 14, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Fair Housing Act. Federal Rehabilitation Act. Anti-Discrimination Law,*
Handicap, Burden of proof, Housing. *Housing. Housing Authority. Summary Process. Words,* "Reasonable accommodation," "Qualified handicapped person."

This court concluded that an elderly couple who were evicted by the local housing authority (authority) for creating excessive noise as tenants in a public housing project failed to establish that the authority discriminated against them in violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B), and G. L. c. 151B, § 4 (7), in denying their request to withdraw or delay the eviction proceedings to engage in an interactive process for determining whether the wife was disabled and what accommodations could be made for her, where the authority did in fact engage in such a process, but the accommodation the tenants sought was not reasonable, as the tenants' behavior was seriously disturbing their neighbors, and the tenants had not proved that they were qualified handicapped persons under the relevant statutes or that they had medical conditions that caused them to make excessive noise. [305-314]

SUMMARY PROCESS. Complaint filed in the Northeast Division of the Housing Court Department on February 28, 2003.

The case was heard by *David D. Kerman,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*John S. Wessler* for the defendants.

*Martin J. Rooney* for the plaintiff.

The following submitted briefs for amici curiae:

*Steven S. Locke & Caitlin A. Sheehan* for Massachusetts Commission Against Discrimination.

*Susan Ann Silverstein & Michael R. Shuster* for AARP.

*Lowry E. Heussler* for Avon Housing Authority & others.

[1] Ginda Barskaya.

SPINA, J. In this summary process action, the Andover Housing Authority (authority), operator of the State-assisted Frye Circle public housing project for the elderly and disabled (Frye Circle), sought to evict Izrail Shkolnik and his wife, Ginda Barskaya (collectively, the tenants), from their apartment for excessive noise in violation of the terms of their lease. A judge in the Housing Court granted possession to the authority, and the tenants appealed. We granted the tenants' application for direct appellate review. The tenants claim that the authority discriminated against them in violation of the Federal Fair Housing Amendments Act (Fair Housing Act), 42 U.S.C. § 3604 (f)(3)(B) (2000); the Federal Rehabilitation Act (Rehabilitation Act), 29 U.S.C. § 794 (2000); and the Massachusetts antidiscrimination statute, G. L. c. 151B, § 4 (7), because the authority failed reasonably to accommodate Barskaya's health problems by withdrawing or delaying eviction proceedings. For the reasons that follow, we affirm the judgment below.[2]

The tenants, both in their early eighties, emigrated from Russia in 1993 and became occupants of a second-floor apartment at Frye Circle[3] in September, 1994. The tenancy was uneventful until October, 1999, when the authority notified the tenants that it had received a complaint from one of their neighbors about the level of noise coming from their apartment on a regular basis. The noise consisted primarily of loud arguing, yelling, and excessive television or radio volume, often in the middle of the night. The authority reminded the tenants of their lease obligation to respect their neighbors' rights to "privacy and quiet."[4]

---

[2]We acknowledge the amicus brief filed by the housing authorities of Avon, Bellingham, Braintree, Canton, Cohasset, Danvers, Dedham, Franklin, Georgetown, Gloucester, Holbrook, Holliston, Hopkinton, Manchester, Medfield, Medway, Millis, Needham, Norfolk, Randolph, Rockport, Rowley, Salisbury, Saugus, Sharon, Stoneham, Stoughton, Sudbury, Topsfield, Walpole, Wayland, Wellesley, Wenham, and Wrentham. We also acknowledge the amicus briefs filed by AARP Foundation Litigation and AARP, and the Massachusetts Commission Against Discrimination.

[3]Frye Circle has 276 housing units, 218 of which are occupied by elderly and disabled tenants.

[4]A copy of the tenants' lease with the authority has not been included in the record, but the tenants do not dispute that the lease imposed such an obligation on them.

In August, 2001, the authority again notified the tenants about a noise complaint. The authority asked the tenants to refrain from turning the volume on their television too loudly. In April, 2002, Shkolnik went to the authority to inquire about the possibility of getting his own apartment, separate from his wife. He was informed that he could complete a transfer application, but Shkolnik did not pursue the matter further. Noise complaints from the tenants' neighbors began to increase. In June, 2002, the authority notified the tenants on two occasions about noise complaints, reminded them about the terms of their lease, and advised them that counselling was available, without charge, from Family Services, Inc. The authority's director also notified the tenants' son about the issue and about services for his parents. The noise problem was particularly acute for Joanne Taylor, a sight-impaired woman with slightly enhanced hearing, who moved into the apartment directly below the tenants in July, 2002, and was particularly sensitive to and disturbed by the tenants' ongoing yelling, stomping on the floor, and loud television.

On October 16, 2002, the authority held a private conference with the tenants to discuss ways of resolving the excessive noise problem. The tenants agreed to use earphones when watching television and to stop screaming at each other and disturbing their neighbors.[5]

Unbeknownst to the authority, Barskaya's health began to deteriorate significantly. She visited a hospital on several occasions where she was diagnosed with and treated for pain, shingles, and mild to moderate dementia.[6] At the same time, the authority continued to receive numerous complaints from Taylor about the ongoing loud noises emanating from the tenants' apartment.

On November 14, 2002, the authority served the tenants with a thirty-day notice to quit. The reason for the eviction was the tenants' continued excessive noise, in violation of the terms of

---

[5]In their brief, the tenants acknowledge that, at this conference, they neither claimed that Barskaya was disabled nor requested any reasonable accommodations for her.

[6]Barskaya also had been diagnosed with non-Hodgkin's lymphoma around 1994, but that disease was being well-managed.

their lease, after having been notified on numerous occasions about the problem and having agreed to modify their offending conduct. The tenants filed a complaint with the authority pursuant to the grievance procedure promulgated by the Department of Housing and Community Development, see 760 Code Mass. Regs. § 6.08 (1998), alleging that they had been issued an unfair notice to quit based on "subjective complaints," and they requested that the notice be withdrawn.[7] In response, the authority held a resolution conference on November 25, 2002, at which the tenants' son presented medical documentation that his mother was suffering from pain and depression, the parties discussed what could be done to resolve the noise issue, and the tenants requested that the authority withdraw the notice to quit because Barskaya was ill. See id. at § 6.08(4)(b). Following the conference, the authority sent the tenants a letter reminding them about making arrangements for Barskaya to receive medical attention, advising them that the authority would not be withdrawing its notice to quit,[8] and informing them that a grievance hearing would be scheduled. See id. at § 6.08(4)(c).

In response to a request from the authority's director, a geriatric nurse specialist from Family Services, Inc., and an outreach coordinator from the Andover Senior Center visited the tenants to assess Barskaya's need for medical or social services. An evaluative hospitalization was suggested so that an appropriate medical treatment plan could be implemented once Barskaya's condition was more fully known. As a result of her hospitalization, Barskaya was diagnosed with post herpetic neuralgia (pain after shingles), chronic lymphoproliferative disorder (lymphoma), Alzheimer's dementia, and depression. She was discharged with a recommendation for outpatient care and psychiatric support.

During November and December, 2002, the authority received numerous noise complaints from Taylor about the tenants. On

[7]Contrary to the tenants' assertion in their brief, their complaint did not allege that Barskaya was disabled or that the notice to quit should be withdrawn so that they could pursue services for her medical conditions.

[8]The authority's decision to move forward with eviction was premised on the idea that if the tenants stopped making excessive noise, then the authority could halt the proceedings because the tenants would no longer be in violation of their lease.

January 8, 2003, a grievance hearing was held. See 760 Code Mass. Regs. § 6.08(4)(f). Shkolnik, speaking through his son, denied that he and his wife had caused any noise. The authority's director reported having received noise complaints on numerous dates, and Taylor stated that she had been disturbed by the tenants' arguments and loud television on a nearly daily basis. Taylor further stated that while she did not want the tenants to lose their apartment, she would like them to be reasonably quiet. After reviewing the evidence, the grievance committee upheld the authority's decision to proceed with the tenants' eviction.

On February 28, 2003, the authority filed its summary process action, seeking possession of the tenants' apartment. In their April 8, 2003, answer and counterclaim, the tenants denied any lease violations, asserted that the eviction proceedings were causing them extreme emotional distress, and alleged that the authority had violated their rights under the Fair Housing Act, the Rehabilitation Act, and G. L. c. 151B, by failing reasonably to accommodate Barskaya's medical conditions. The tenants also requested the following accommodations: (1) installation of acoustical carpeting in their apartment; (2) installation of a sound-absorbing drop ceiling in Taylor's apartment; (3) a room air conditioner so that windows could remain closed in warm weather; and (4) dismissal or continuation of the summary process action until after installation of the requested accommodations.

The authority proceeded to investigate the feasibility of the requested physical modifications. It concluded that "acoustical carpeting" did not exist and that a drop ceiling could not be installed because the existing ceiling was too low and the door frames were too high. Installation of a room air conditioner would be possible. The authority set up yet another meeting between the tenants and Taylor further to discuss resolution of the noise problem, but the meeting was cancelled by the tenants' attorney. Notwithstanding the fact that Barskaya began to receive more intensive medical care, which somewhat improved her condition, she was not entirely compliant with the treatment, and complaints about the tenants' excessive noise continued.

Following a bench trial on the authority's summary process action, the judge found that the tenants' noise was severe and recurring, and that unless it was abated, the authority would be entitled to possession of their apartment. The judge opined that there was no merit to the tenants' contention that, prior to eviction proceedings, the authority had made no attempt to reach a reasonable accommodation. To the contrary, the judge found significant the tenants' repeated denials that they were the cause of excessive noise and the authority's efforts to resolve the problem short of eviction. The judge dismissed the tenants' counterclaim for discrimination. He also stayed the entry of judgment on the summary process action so the tenants could continue to work with the authority and with their neighbors in order reasonably to accommodate all residents' needs. Three months later, after a hearing, judgment entered awarding the authority possession of the apartment, presumably because the tenants had continued to violate the terms of their lease.[9] Ultimately, the tenants were moved to an apartment in another housing complex owned by the authority.

The thrust of the tenants' argument here is that they made a request for a reasonable accommodation of Barskaya's medical conditions at the November 25, 2002, resolution conference, namely the withdrawal or delay of eviction proceedings. At that point, the tenants contend, the authority was required to engage in an interactive process for determining whether Barskaya was disabled[10] and what accommodations could be made for her. The tenants argue that the authority made no effort to engage in this process and simply decided to proceed with eviction. They further assert that, even if the authority did not recognize its obligation to the tenants at the time of the resolution hearing, reasonable accommodations should have been made as of the grievance hearing on January 8, 2003. The tenants conclude that the authority's failure to engage in this interactive process and provide reasonable accommodations constituted discrimination

---

[9]The record is devoid of any information about this proceeding other than a docket entry.

[10]In this opinion, we use the terms "disabled" and "handicapped" interchangeably. There is no distinction of substance in their meaning. See *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 236 n.7 (2001).

in violation of the Fair Housing Act, 42 U.S.C. § 3604 (f)(3)(B), and G. L. c. 151B, § 4 (7).[11] We disagree.

When reviewing the trial judge's decision, we accept his findings of fact as true unless they are clearly erroneous, and we give due regard to the judge's assessment of the witnesses' credibility. See Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996). See also *Perez* v. *Boston Hous. Auth.*, 379 Mass. 703, 705 (1980). On the other hand, "we scrutinize without deference the legal standard which the judge applied to the facts." *Kendall* v. *Selvaggio*, 413 Mass. 619, 621 (1992). When interpreting those specific provisions of G. L. c. 151B that are pertinent here, we consider Federal case law construing cognate provisions of the Fair Housing Act unless we discern a reason to depart from those decisions. See *New Bedford* v. *Massachusetts Comm'n Against Discrimination*, 440 Mass. 450, 463 n.26 (2003); *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 237-238 (2001).

Both the Fair Housing Act and G. L. c. 151B prohibit discrimination in housing based on handicap.[12] See 42 U.S.C. § 3604 (f)(2); G. L. c. 151B, § 4 (7). The term "handicap" is defined as "(1) a physical or mental impairment which substantially limits one or more of [a] person's major life activi-

[11]In their counterclaim to the authority's summary process action, the tenants also alleged that the authority had engaged in discrimination in violation of the Federal Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 794. Section 504(a) of the Rehabilitation Act states in relevant part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). See *Dahill* v. *Police Dep't of Boston, supra* at 238 n.8. At trial, counsel for the tenants made no mention of the Rehabilitation Act, and there is no evidence in the record to show that Frye Circle is federally subsidized. Cf. *City Wide Assocs.* v. *Penfield*, 409 Mass. 140, 141 (1991) (residential tenancy subsidized under Federal Section 8 Moderate Rehabilitation Program); *Whittier Terrace Assocs.* v. *Hampshire*, 26 Mass. App. Ct. 1020 (1989) (housing project subsidized by United States Department of Housing and Urban Development). Therefore, we will not consider the tenants' claim of discrimination under the Rehabilitation Act.

[12]Unlike the Rehabilitation Act, the protections afforded by the Federal Fair Housing Amendments Act (Fair Housing Act), 42 U.S.C. §§ 3601 et seq., extend beyond programs receiving Federal financial assistance. See 42 U.S.C. § 3603.

ties, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602 (h). See G. L. c. 151B, § 1 (17) (same language). Discrimination prohibited by the Fair Housing Act includes the "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling."[13] 42 U.S.C. § 3604 (f)(3)(B). See G. L. c. 151B, § 4 (7A) (2) (same language).

"A 'reasonable accommodation' is one which would not impose an undue hardship or burden on the entity making the accommodation." *Peabody Props., Inc.* v. *Sherman*, 418 Mass. 603, 608 (1994) (reasonable accommodation of tenant's handicap under Fair Housing Act did not preclude landlord from evicting tenant for drug activity on premises). See *Rakuz* v. *Spunt*, 39 Mass. App. Ct. 171, 176 (1995). See also G. L. c. 151B, § 4 (7A). The mandate for reasonable, but not oner- ous, accommodations strikes "a balance between the statutory rights of the handicapped . . . and the legitimate interests of federal grantees in preserving the integrity of their programs." *City Wide Assocs.* v. *Penfield*, 409 Mass. 140, 142 (1991), quot- ing *Alexander* v. *Choate*, 469 U.S. 287, 300 (1985). The determination whether a requested accommodation is reasonable is fact specific and will be resolved on a case-by-case basis. See *Groner* v. *Golden Gate Gardens Apartments*, 250 F.3d 1039, 1044 (6th Cir. 2001); *United States* v. *California Mobile Home Park Mgt. Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994). A tenant who has alleged discrimination based on a landlord's failure reasonably to accommodate a handicap has the burden of prov- ing that the proposed accommodation is reasonable. See *Groner* v. *Golden Gate Gardens Apartments*, *supra* at 1044-1045. See also *Loren* v. *Sasser*, 309 F.3d 1296, 1302 (11th Cir. 2002), cert. denied sub nom. *Newbold* v. *Sasser*, 538 U.S. 930 (2003), and

---

[13]The concept of "reasonable accommodation" was adopted by the Fair Housing Act from § 504 of the Rehabilitation Act, 29 U.S.C. § 794, and cases interpreting that term under the Rehabilitation Act are applicable to claims brought pursuant to the Fair Housing Act. See *Groner* v. *Golden Gate Gardens Apartments*, 250 F.3d 1039, 1044 (6th Cir. 2001); *Smith & Lee Assocs., Inc.* v. *Taylor*, 102 F.3d 781, 795 (6th Cir. 1996).

cert. denied, 538 U.S. 1057 (2003); *Bryant Woods Inn, Inc.* v. *Howard County*, 124 F.3d 597, 603-604 (4th Cir. 1997); *Elderhaven, Inc.* v. *Lubbock*, 98 F.3d 175, 178 (5th Cir. 1996). Cf. *City Wide Assocs.* v. *Penfield, supra* at 143 ("As with any other discrimination claim, the burden is on the tenant to prove a prima facie case of discrimination"). Contrast *Hovsons, Inc.* v. *Brick*, 89 F.3d 1096, 1103 (3d Cir. 1996) (burden on defendant township to prove that proposed accommodation not reasonable). "The text of the Fair Housing Act provides no hint that Congress sought to change the normal rule that a plaintiff bears the burden of proving a violation of law by a preponderance of the evidence." *Elderhaven, Inc.* v. *Lubbock, supra.*

As to the process by which a purportedly reasonable accommodation is reached, we have stated, in the employment context, that "it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in [an] interactive process of determining one." *Ocean Spray Cranberries, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 644 (2004), quoting *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 457 (2002). "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation . . . through a flexible, interactive process that involves both the employer and the qualified individual with a disability." 29 C.F.R. § 1630 App. (2004). Unlike the employment context, however, there is no language in the Fair Housing Act, or the relevant sections of the Department of Housing and Urban Development's implementing regulations, 24 C.F.R. §§ 100.200-100.205 (2004), that imposes an obligation on landlords and tenants to engage in an interactive process for reaching appropriate reasonable accommodations. See *Lapid-Laurel, L.L.C.* v. *Zoning Bd. of Adjustment of Scotch Plains*, 284 F.3d 442, 455-456 (3d Cir. 2002); *Groner* v. *Golden Gate Gardens Apartments, supra* at 1047. Nonetheless, such a process is the optimal way for a landlord and tenant to explore the scope of the tenant's alleged handicap as well as the availability and feasibility of various

accommodations.[14] See *Jankowski Lee & Assocs.* v. *Cisneros,* 91 F.3d 891, 895 (7th Cir. 1996).

In the circumstances of this case, we conclude that the authority did attempt to engage the tenants in an interactive process for ascertaining and, subsequently, accommodating Barskaya's medical conditions,[15] but that the "accommodation" sought by the tenants, namely the withdrawal or delay of eviction proceedings,[16] was not reasonable.

As a preliminary matter, we note that the tenants did not present any evidence at trial that they were "qualified" handicapped persons such that, even if reasonable accommoda-

---

[14]Although it does not carry the force of law, the Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Accommodations Under the Fair Housing Act at 7 (2004), is instructive and provides: "An interactive process in which the housing provider and the requester discuss the requester's disability-related need for the requested accommodation and possible alternative accommodations is helpful to all concerned because it often results in an effective accommodation for the requester that does not pose an undue financial and administrative burden for the provider."

[15]The trial judge made no determination, either as a matter of fact or law, that Barskaya was "handicap[ped]," as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602 (h), and G. L. c. 151B, § 1 (17). The tenants were required to demonstrate three factors: (1) Barskaya's condition constituted a physical or mental "impairment"; (2) that affected at least one of her "major" life activities; (3) to a substantial degree. See *New Bedford* v. *Massachusetts Comm'n Against Discrimination,* 440 Mass. 450, 462-463 (2003), and cases cited. See also *Bercovitch* v. *Baldwin Sch., Inc.,* 133 F.3d 141, 155 (1st Cir. 1998). Analysis of whether each of these factors has been established is critical because not every physical or mental impairment is considered to be a "handicap." See *New Bedford* v. *Massachusetts Comm'n Against Discrimination, supra* at 462. See also *Soileau* v. *Guilford of Me., Inc.,* 105 F.3d 12, 15 (1st Cir. 1997). Although the judge's opinion does not indicate that he engaged in this analysis, his opinion suggests that he found that Barskaya *was* handicapped because the judge opines that if the tenants' recurring noise disturbances were not causally related to Barskaya's disabilities, then the authority would be entitled to possession of the property for lease violations. Because the authority has not challenged whether Barskaya's impairments constituted a "handicap," we will assume, without deciding, that they did.

[16]The tenants have asserted that they asked the authority to withdraw the notice to quit at the resolution conference held on November 25, 2002. We question whether this was, in fact, a request for a reasonable accommodation of a handicap, or merely a simple request that they not be evicted because, as the tenants later claimed, they had not caused excessive noise. If the latter were the case, no accommodation would be necessary because, in the opinion of the tenants, there was no problem.

tions were made, they would be able to comply with the terms of their lease. The term "qualified handicapped person" typically has been discussed in the employment context. General Laws c. 151B, § 4 (16), provides that it is unlawful for an employer "to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because· of his handicap, *any person alleging to be a qualified handicapped person,* capable of performing the essential functions of the position involved with reasonable accommodation" (emphasis added). An employee is not "a 'qualified handicapped person' within the meaning of G. L. c. 151B and therefore is not entitled to the protection of that statute" if he engages in conduct "significantly inimical to the interests of his employer and in violation of the employer's rules." *Garrity* v. *United Airlines, Inc.,* 421 Mass. 55, 63 (1995). This is true even where an employee's disability arguably causes the misconduct at issue. *Id.* at 62-63. The term "qualified" handicapped person is not used in either the Fair Housing Act, 42 U.S.C. § 3604 (f)(2), or G. L. c. 151B, § 4 (7A) (2). However, it is used in § 504 of the Rehabilitation Act, 29 U.S.C. § 794, to which both of those statutes are analogous. See *supra* at 9 & n.13. We see little reason not to consider whether a plaintiff is a "qualified" handicapped person in the context of a housing discrimination claim "because many of the issues that arise in the 'qualified' analysis, also arise in the context of the 'reasonable modifications' or 'undue burden' analysis. That is, if more than reasonable modifications are required of an institution in order to accommodate an individual, then that individual is not qualified for the program." *Bercovitch* v. *Baldwin Sch., Inc.,* 133 F.3d 141, 154 (1st Cir. 1998). In the public housing context, a "qualified" handicapped individual is one who could meet the authority's eligibility requirements for occupancy and who could meet the conditions of a tenancy, with a reasonable accommodation or modification in the authority's rules, policies, practices, or services. See G. L. c. 121B, § 32; 760 Code Mass. Regs. §§ 5.00 (1996); 760 Code Mass. Regs. §§ 6.00 (1998). Cf. *Whittier Terrace Assocs.* v. *Hampshire,* 26 Mass. App. Ct. 1020, 1020-1021 (1989). Here, the tenants made no showing that, even if eviction proceedings were withdrawn or delayed,

they could comply with the terms of their lease by not disturbing their neighbors. The evidence plainly suggested otherwise.

The focus of the trial was the reasonableness of the tenants' request that eviction proceedings be withdrawn or delayed as an "accommodation" for Barskaya's medical conditions. By the time the resolution conference was held, the authority had received numerous complaints about the tenants' noise, had notified them about the problem, had reminded them about the provision in their lease forbidding loud noise, had suggested family counselling, had contacted their son, had held an informal conference to address the problem, and had received the tenants' assurances that they would take steps to be quieter. The authority's awareness of a noise issue did not lead to an inevitable conclusion that medical concerns might be at the root of the problem. Only the tenants would be privy to that sort of information in the first instance. However, the tenants had not advised the authority that they were suffering from any physical or mental conditions that caused them to make excessive noise and, in fact, they denied that noise was coming from their apartment on a regular basis. When there was no improvement in the situation and the authority continued to receive complaints, it was left with little recourse but to commence eviction proceedings. Otherwise, the quiet enjoyment of the tenants' neighbors would continue to be severely disrupted.[17]

This court has rejected the idea that indefinite requests for "more time" to address a disabling condition are reasonable.

---

[17]The authority has an equal responsibility to all of its public housing tenants, many of whom are disabled or elderly. General Laws c. 186, § 14, imposes liability on "any lessor or landlord who directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant." In *Doe* v. *New Bedford Hous. Auth.*, 417 Mass. 273, 285 (1994), we stated that "[t]he covenant of quiet enjoyment protects a tenant's right to freedom from serious interference with [her] tenancy — acts or omissions that impair the character and value of the leasehold." The interference need not arise directly from the landlord's conduct. *Id.* A landlord may be liable as a result of the conduct of third parties if serious interference with a tenancy is a "natural and probable consequence of what the landlord did, what he failed to do, or what he permitted to be done." *Id.*, quoting *Blackett* v. *Olanoff*, 371 Mass. 714, 716 (1977). Here, if the authority failed to take action against the tenants for excessive and largely unabated noise that plainly breached Taylor's quiet enjoyment of her apartment, such inaction could constitute a violation of G. L. c. 186, § 14.

See, e.g., *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 455-456 (2002) (reasonable accommodation does not require employer to give employee indefinite leave of absence to resolve medical issue). Here, the judge's finding that withdrawal of the notice to quit or delay of the eviction proceedings would have served no useful purpose was warranted.[18] While we are mindful that the tenants' interest in maintaining their housing is significant, they have nonetheless failed to meet their burden of showing that their requested accommodation was reasonable. There was simply a lack of evidence that if the tenants' eviction was delayed, they could conform their conduct to the terms of their lease, particularly where they were denying that they were the cause of a significant problem.

A delay might have been a reasonable accommodation if no neighbors were being seriously disturbed by the tenants' behavior. However, that was clearly not the case. See, e.g., *City Wide Assocs.* v. *Penfield*, 409 Mass. 140, 143-144 (1991) (forbearance from eviction proceedings constituted reasonable accommodation where damage caused by mentally disabled tenant was small and no evidence that other tenants affected by conduct). Taylor's rights need not have been sacrificed "on the altar" of reasonable accommodation. See *Groner* v. *Golden Gate Gardens Apartments*, 250 F.3d 1039, 1046 (6th Cir. 2001). Nearly seven months passed from the time that the tenants were served with the notice to quit and the trial was held in the summary process action. That was more than ample time for the tenants to put in place an effective treatment plan for addressing Barskaya's health problems while eliminating, or significantly reducing, the excessive noise emanating from her apartment. The fact that Taylor was still complaining about the noise on a daily basis in May, 2003, suggests that the tenants were unable to abate the problem.

Although the authority refused to withdraw the notice to quit or delay eviction proceedings, it made every effort to engage in an interactive process for ascertaining and accommodating Bar-

---

[18]Notwithstanding this finding, the judge still gave the tenants additional time so that they could continue to work with their family, health professionals, Taylor, and the authority to resolve their excessive noise problem. Even after three more months, the tenants were unable to accomplish this task.

skaya's condition. It communicated with the tenants and their son on numerous occasions about ways of resolving the excessive noise problem. Although it tried to steer the tenants to appropriate services, the authority has no power to compel the tenants to seek medical attention, see G. L. c. 121B, § 26, and there was evidence that Barskaya was resistant to treatment. When, in April, 2003, the tenants requested physical modifications to their apartment, the authority promptly responded to the request by investigating the proposals and evaluating their feasibility.[19] Beyond the steps taken here, it is not reasonable to require a public housing authority to diagnose its tenants' medical problems, to ensure that they are receiving appropriate care, and to ignore the impact of lease-violating behavior on other residents in the name of making an accommodation.

We make a final observation. The "interactive process" can only work effectively when a housing authority is made aware of a tenant's physical or mental disability at the earliest opportunity. A housing authority cannot accommodate a disability that it does not know exists. This is especially true where the nature of the disability is not readily apparent on observation. Cf. *Petsch-Schmid v. Boston Edison Co.*, 914 F. Supp. 697, 704 (D. Mass. 1996), aff'd, 108 F.3d 328 (1st Cir. 1997) ("there is no requirement that an employer know the precise nature of an individual's impairment to be found to have discriminated against her"). A tenant's request for a reasonable accommodation should inform the landlord that the tenant is a qualified handicapped person, and that the tenant is currently being denied an equal opportunity to use and enjoy a dwelling. Cf. *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 649 n.21 (2004). Placing the burden on a tenant to acknowledge a disability and the role it may play in a purported lease violation would relieve a housing authority, which may be unable to access adequate information, of that difficult task. The purpose of the administrative process is to enable a public housing authority to resolve lease violations without resorting to summary process. This purpose is frustrated if a tenant is allowed to put forth changing defenses at various

---

[19]The tenants did not produce any evidence as to the existence, availability, and cost of "acoustical carpeting" as a reasonable accommodation.

levels of eviction proceedings (informal settlement conference, grievance hearing, trial, and appellate review). During the administrative process here, the tenants simply denied that there was an ongoing and excessive noise problem. By taking this position, the tenants impeded the authority's efforts to engage in a full interactive dialogue to ascertain and ultimately accommodate Barskaya's medical conditions. Having done so, the tenants then attacked the authority at trial for failing to do more. Cf. *Portela-Gonzalez* v. *Secretary of the Navy*, 109 F.3d 74, 78 (1st Cir. 1997) ("a party cannot take one position in an underlying administrative proceeding and then disclaim it in a subsequent suit arising out of the agency proceedings"). Tenants' shifting arguments can be a continual challenge for public housing authorities facing reasonable accommodation requests. The role of a public housing authority is to provide housing for as many qualified tenants as possible. Eviction of those who threaten the well-being of the community is a necessary component of that function. The decision to evict an allegedly handicapped tenant from public housing should be based on consistent and complete information gathered through the interactive process.

In conclusion, the tenants have failed to establish that the authority discriminated against them in violation of the Fair Housing Act, 42 U.S.C. § 3604 (f)(3)(B), and G. L. c. 151B, § 4 (7), by failing reasonably to accommodate Barskaya's medical conditions.

*Judgment affirmed.*