BOSTON HOUSING AUTHORITY *vs*. EMMITT BRIDGEWATERS.

No. 06-P-145.

Suffolk. November 10, 2006. - August 20, 2007.

Present: KANTROWITZ, McHUGH, & GREEN, JJ.

Further appellate review granted, 450 Mass. 1103 (2007).

*Boston Housing Authority. Housing. Due Process of Law,* Housing. *Anti-Discrimination Law,* Handicap, Housing. *Words,* "Reasonable accommodation."

In a summary process proceeding brought by a public housing authority (authority) against a tenant after he had pleaded guilty to a series of criminal charges stemming from his violent assault on his disabled brother, who was also a tenant at the same public housing development, the judge did not err in denying the tenant's motion for relief from the judgment awarding possession to the authority, where the tenant, who had engaged in conduct that violated the authority's rules and was significantly inimical to the authority's obligation to provide a physically safe environment for its tenants, was not a qualified handicapped person entitled to the authority's general obligation to provide reasonable accommodations for its handicapped tenants. [762-769]

In the circumstances of a motion for relief from judgment, brought by the tenant in a summary process action who contended that his failure to develop at trial a defense based on reasonable accommodation amounted to excusable neglect, the judge's conclusions that the defendant did not satisfy the requisite factors for such relief were within the range of reason and evinced no abuse of discretion [769]; further, the judge correctly ruled that the defendant's claim that the landlord's termination notice was defective had been waived by the defendant's failure to raise the claim before or during trial [769-770].

SUMMARY PROCESS. Complaint filed in the Boston Division of the Housing Court Department on March 22, 2004.

The case was heard by *Steven D. Pierce*, J., and posttrial motions were heard by him.

*Ann E. Jochnick (James M. McCreight & Richard M.W. Bauer* with her) for the defendant.

*Jay S. Koplove* for the plaintiff.

The following submitted briefs for amici curiae:

*Thomas P. Murphy* for Disability Law Center & others.

*Amy Copperman & Judith Liben* for Massachusetts Union of Public Housing Tenants.

*Susan Ann Silverstein & Michael Schuster,* of the District of Columbia, for AARP.

McHUGH, J. Emmitt Bridgewaters (Bridgewaters), a tenant in a residential complex owned and operated by the Boston Housing Authority (BHA), appeals from a summary process decision of the Housing Court evicting him and awarding possession of his unit to the BHA. The BHA commenced the summary process action after Bridgewaters pleaded guilty to a series of criminal charges stemming from his assault on his brother, Eric Bridgewaters (Eric). Bridgewaters's principal claim on appeal is that the BHA and the Housing Court failed to consider his entitlement to a reasonable accommodation for a mental illness that produced the assault.

1. *Background.* Since April 1, 2000, Bridgewaters has been a tenant under a written lease in the BHA's public housing complex located at 129 Elm Hill Avenue in the Dorchester section of Boston. Among other things, Bridgewaters agreed in the lease to

> "[c]onduct [himself] . . . in a manner which will not disturb any other resident's or neighbor's peaceful enjoyment of their accommodations, will not harass, injure, endanger, threaten or unreasonably disturb any other resident . . . and which will be conducive to maintaining the development in a decent, safe and sanitary condition."

The lease also provided for termination if Bridgewaters engaged in

> "[a]ny criminal or other activity which threatens the health or safety of another resident or a BHA employee, or which threatens their rights to peaceful enjoyment of public housing premises, or which threatens the health or safety of any person residing in the immediate vicinity of the public housing premises [or] [a]ny violent . . . criminal activity on or off the BHA property."

See 42 U.S.C. § 1437d(l)(6) (2000); G. L. c. 121B, § 32.

On January 10, 2004, Bridgewaters was involved in a physical altercation with his partially paralyzed[1] twin brother, Eric, who was a tenant in a separate unit of the 129 Elm Hill Avenue development. According to Eric, he and Bridgewaters were arguing about childhood favoritism, slights, and insults, when suddenly Bridgewaters threw a glass of water in his face, then threw him "to the floor, kicked him in the eye and forehead and stomped and kicked him repeatedly about the neck and back." As the trial judge noted in his "Memorandum of Decision and Order on Defendant's Motion for Relief from Judgment," the beating was so severe that Eric "suffered paralysis in his other leg."

The police were called and came to the scene. Bridgewaters met the responding officers outside the apartment building, hoping "to tell his side of the story before the officers spoke to Eric." Among other things, Bridgewaters informed the police that Eric's injuries were self-inflicted and that he had only punched Eric once, in self-defense.[2] However, as noted by the judge in his memorandum, Eric's medical records indicated injuries that were "consistent with Eric's testimony that he was kicked in the eye, forehead, neck and back." The police arrested Bridgewaters, and following a plea or admission to sufficient facts, he was found guilty of assault and battery by means of a dangerous weapon, see G. L. c. 265, § 15A; assault and battery, see G. L. c. 265, § 13A; and assault and battery on a person with a disability, see G. L. c. 265, § 13K.

Relying on the lease provisions dealing with criminal activity, the BHA commenced a summary process action seeking to evict Bridgewaters from the complex. Bridgewaters did not file a written answer to the BHA's complaint. At trial, he represented himself, although he had been represented by counsel earlier, and offered testimony in which he recounted his version (or versions) of what had happened on the night in question. Throughout the trial, Bridgewaters insisted that some of Eric's injuries were self-inflicted and that any injuries he himself

---

[1]Eric suffered a stroke as a child, which paralyzed the left side of his body.

[2]Bridgewaters alleged, even at trial, that Eric had bitten him. The judge noted that apart from his own testimony on this point, Bridgewaters produced no evidence to support the biting allegation.

inflicted were the product of self-defense. Bridgewaters also testified that Eric was lying about the attack or exaggerating the magnitude of his injuries.

On four occasions during the trial, Bridgewaters testified that he suffered from bipolar disorder and manic depression[3] and had not been taking his prescribed medication at the time of the assault. Although Bridgewaters had not asked before or during the trial for a "reasonable accommodation" for his mental health issues,[4] the trial judge inquired at one point whether the matter should be referred to the Boston Tenancy Preservation Program (TPP).[5] However, the attorney for BHA stated that, because of

---

[3]In his posttrial motions, Bridgewaters claimed that he suffers from bipolar disorder and borderline personality disorder.

[4]The first of Bridgewaters's four references to mental impairment explained his use of prepared written testimony:

> "I'm reading from a testimonial that I had written down to my account because I have a disability in which I suffer from bipolar and I'm manic depressive. And, I have trouble recollecting some . . . situations so I have times where I jot down things."

The three succeeding references were clearly intended as defenses to his conduct:

> "I can honestly say in my defense that I was not on my medication that I was . . . . Because at the time Doctor Gardos did not have me on my medication. I was taking Depocode [*sic*] but I was taken off of it I need the guidance of Doctor Gardos because it did increase weight gain. Substantial amount of weight gain, they took me off and I'm now currently taking Topamax."

> ". . .

> "All I'd say your Honor my defense is again I take full responsibility to a certain degree for my actions. Like I said I was not on my medications at the time of the incident."

> ". . .

> "[A]gain I was not on my medication at the time there. . . . But I can honestly say I am in a better situation today than what I was on the 10th. Like I said I go to my treatment facility on a daily basis Monday through Fridays from 9:00 in the morning to 3:00 with the exception of doctors' appointments that I may have. I'm taking Topamax I'm taking Seroquel."

[5]The Boston Tenancy Preservation Project is a "program designed to prevent homelessness for adults and families with disabilities who are facing

the severity of Bridgewaters's assault, it was not interested in preserving Bridgewaters's tenancy. As a result, the judge concluded that the TPP process could not be invoked.

Ultimately, the judge found "that [Bridgewaters] violated a provision of his lease by committing a crime on the public housing development grounds that threatened the health and safety of another resident." Accordingly, he granted the BHA possession of Bridgewaters's apartment.

After trial, Bridgewaters obtained counsel and filed a "Motion to Alter/Amend Or Reconsider Findings of Fact, Rulings of Law and Order for Judgment, Or Provide Relief from Judgment." The motion, brought under Mass.R.Civ.P. 59, 365 Mass. 827 (1974),[6] sought relief from the Housing Court's judgment, arguing that Bridgewaters was entitled to a reasonable accommodation from application of the BHA's rules and policies because he was handicapped by mental disabilities, specifically bipolar disorder and borderline personality disorder. The judge denied the motion, stating:

> "Motion is DENIED. Issue not raised at trial or before; even if it were, *Peabody Properties[, Inc.]* v. *Sherman*[, 418 Mass. 603 (1994),] controls. [Bridgewaters] took guilty plea to violent acts, no reasonable accommodation [would] be required."

Bridgewaters then filed a similar motion for relief from judgment pursuant to Mass.R.Civ.P. 60(b)(1), 365 Mass. 828 (1974), which also raised, for the first time, the issue of a defective notice to quit. The claimed defect was a statement in the notice that it was "effective immediately" when the lease and the fair housing laws required a "reasonable period of time" to vacate. In a thoughtful memorandum analyzing all the posttrial claims Bridgewaters had raised, the judge denied the motion.

On appeal, Bridgewaters maintains that he is a disabled individual entitled to reasonable accommodations in the application of BHA rules and procedures and that his eviction

eviction from their homes." See http://www.baycove.org/Outside/catalog/ResServMMI/TPP.pdf (last visited August 16, 2007).

[6]The motion was actually made pursuant to Mass.R.Civ.P. 59 and Mass.R.Civ.P. 60(b)(1), (2), (5), and (6), 365 Mass. 828 (1974). The judge dealt with the motion exclusively under rule 59.

without an attempt to accommodate his disability constitutes discrimination in violation of several Federal and State laws, including the Federal Rehabilitation Act (Rehabilitation Act), 29 U.S.C. § 794 (2000); the Federal Fair Housing Amendments Act (Fair Housing Act), 42 U.S.C. § 3604(f)(3)(B) (2000); the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (1990); the Massachusetts antidiscrimination statute, G. L. c. 151B, § 4(6) and (7A); and art. 114 of the Amendments to the Massachusetts Constitution. He also maintains that the notice of termination was defective and that the judge abused his discretion in denying relief pursuant to Mass.R.Civ.P. 60(b)(1). We find no error and therefore affirm.[7]

2. *Analysis.* "When reviewing the trial judge's decision, we accept his findings of fact as true unless they are clearly erroneous, and we give due regard to the judge's assessment of the witnesses' credibility." *Andover Hous. Authy.* v. *Shkolnik*, 443 Mass. 300, 306 (2005) (*Andover Hous. Authy.*), citing Mass. R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996). However, "we scrutinize without deference the legal standard which the judge applied to the facts." *Ibid.*, quoting from *Kendall* v. *Selvaggio*, 413 Mass. 619, 621 (1992).

a. *Reasonable accommodation.* Several Federal and State laws prohibit the BHA from discriminating against a tenant on the basis of his or her mental disability. See 42 U.S.C. § 3604(f); 29 U.S.C. § 794; 42 U.S.C. §§ 12101 et seq.; G. L. c. 151B, § 4(6), (7A). Under fair housing laws, discrimination includes a landlord's "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). See G. L. c. 151B, § 4(7A)(2) (same language).

The thrust of Bridgewaters's posttrial motions and his appeal is that his mental illness is a handicap controllable by medication. He claims that he attacked his brother because he

---

[7]We acknowledge the amicus curiae brief filed by the Disability Law Center, the Mental Health Legal Advisors Committee, the Center for Public Representation, and the Coalition for the Legal Rights of People with Disabilities. We also acknowledge the amicus curiae briefs filed by AARP and the Massachusetts Union of Public Housing Tenants.

was not taking any medication. Now back on appropriate medication and more closely supervised by his doctors and therapists, he urges that he is entitled to a reasonable accommodation, namely, a second chance from the BHA. Bridgewaters further claims that the BHA's failure to investigate the viability of his proposed reasonable accommodation constitutes discrimination under the fair housing and antidiscrimination laws. He insists that he properly asserted an affirmative defense at trial based on his handicap and that the trial judge erred in failing to consider it.

The parties spend a large amount of time in their briefs discussing the merits of Bridgewaters's request for a reasonable accommodation. They dispute whether Bridgewaters is indeed disabled. They argue about BHA's knowledge of Bridgewaters's alleged disability. They also argue how, if at all, exceptions to the fair housing and antidiscrimination laws for threatening or egregious behavior should apply to this case.

The difficulty with these arguments is that all except the last proceed in the absence of an evidentiary record sufficient to support them. Although "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling," is discrimination prohibited by State and Federal law, see 42 U.S.C. § 3604(f)(3)(B); G. L. c. 151B, § 4(7A)(2), typically "[t]he determination whether a requested accommodation is reasonable is fact specific and will be resolved on a case-by-case basis." *Andover Hous. Authy.*, 443 Mass. at 307.[8] While Bridgewaters mentioned his mental health problems at trial and in posttrial submissions, see notes 3 & 4, *supra*, the arguments

---

[8]Discrimination through failure to make reasonable accommodations for a handicap is an affirmative defense as to which the tenant has the burden of proof. See *Andover Hous. Authy.*, 443 Mass. at 307. The fact-intensive nature of the inquiry is revealed by the nature of the tenant's prima facie case, i.e., that (1) he or she suffers from a "handicap" or "disability" as that term is defined in the fair housing and antidiscrimination laws; (2) "the landlord knew or should have known of the disability"; (3) "an accommodation of the disability may be necessary to afford the tenant an equal opportunity to use and enjoy" his or her apartment; (4) "the tenant requested a reasonable accommodation[;] and (5) the landlord refused to grant a reasonable accommodation." *Douglas* v. *Kriegsfeld Corp.*, 884 A.2d 1109, 1129 (D.C. 2005). See *United States* v. *California Mobile Home Park Mgmt. Co.*, 107

raised in the appellate briefs were not the subject of trial testimony or other evidence of the type that is always necessary if abstract claims are to become fact-based contentions that a court can resolve.

From Bridgewaters's standpoint, though, the problem is deeper, for decided cases show that his conduct was of a kind and quality that relieved the BHA of its customary obligation to explore reasonable accommodations. An understanding of that conclusion requires a brief review of several "reasonable accommodation" cases in the employment and housing areas.

First, in *Garrity* v. *United Airlines, Inc.*, 421 Mass. 55 (1995) (*Garrity*), the Supreme Judicial Court faced an airline customer service representative's claim that her alcoholism had led her to violate company rules and to engage in conduct detrimental to her employer's interests. She further claimed that the employer had discriminated against her in violation of G. L. c. 151B by discharging her for her conduct without considering reasonable accommodations to deal with her illness. *Id.* at 59-60.

Proof of Garrity's discrimination claim required her to prove that she was handicapped, that she had been fired because of her handicap, and that in spite of the handicap, she was qualified for her job, i.e., that she was a "qualified handicapped person." *Id.* at 60. See G. L. c. 151B, §§ 1(16), 4(16). The court agreed that Garrity was handicapped by alcoholism and that she had been fired because of that handicap. *Garrity, supra* at 61. Following the lead of several Federal decisions, however, the court concluded that, as matter of law, she could not demonstrate that she was qualified for the job. *Id.* at 61-63.

In reaching that decision, the court considered the basic purpose of laws prohibiting handicap discrimination and agreed with the United States District Court for the District of Columbia when it said that Federal laws prohibiting handicap discrimination are

> "designed to put individuals with disabilities on equal footing with nondisabled people in regards to the hiring, promotion, and discharge decisions of the federal govern-

F.3d 1374, 1380 (9th Cir. 1997); *Radecki* v. *Joura*, 114 F.3d 115, 116 (8th Cir. 1997); *Giebeler* v. *M&B Assocs.*, 343 F.3d 1143, 1147 (9th Cir. 2003).

ment and its grantees. [Those laws are] not designed to insulate them from disciplinary actions which would be taken against any employee regardless of his status."

*Id.* at 62-63, quoting from *Wilber* v. *Brady*, 780 F. Supp. 837, 840 (D.D.C. 1992). Against that backdrop, the court announced that it would follow the lead of several Federal decisions to the effect that

"a handicapped employee who engages in conduct significantly inimical to the interests of his employer and in violation of the employer's rules is not an 'otherwise qualified' person within the meaning of the Rehabilitation Act. We conclude that such a person is not a 'qualified handicapped person' within the meaning of G. L. c. 151B and therefore is not entitled to the protection of that statute."

*Id.* at 63.

More recently, in *Mammone* v. *President & Fellows of Harvard College*, 446 Mass. 657 (2006) (*Mammone*), the court reached the same conclusion in the case of an employee who was discharged after serious misconduct that he alleged was the result of his bipolar disorder. The court observed that its decision in *Garrity* "confirmed the commonsense notion that an employee is not 'qualified' for a particular job — i.e., cannot perform the essential functions of that job, even with reasonable accommodation — if he or she takes part in 'egregious misconduct' in the workplace." *Id.* at 667. It then stated that an employee's ability to perform in satisfactory fashion in the future if provided with a reasonable accommodation was not a relevant consideration:

"[E]gregious workplace misconduct disqualifie[s] an employee from protection of the statute without regard to whether that employee could at some future date conform her behavior to acceptable standards. The statutory definition does not require otherwise. An employee who has committed egregious workplace misconduct (conduct so inimical to an employer's interest that any employee would be fired for the same acts) has precluded himself from 'performing the essential functions of the position,' with or without a reasonable accommodation."

*Id.* at 670.

Both *Garrity* and *Mammone* dealt with claims of employment discrimination, not housing discrimination of the type Bridgewaters alleges here. But *Andover Hous. Authy.* v. *Shkolnik*, 443 Mass. 300 (2005), dealt with a claim that a public housing authority had discriminated against two tenants against whom it brought eviction proceedings without first engaging in efforts to provide them with a reasonable accommodation for their handicap. One of the tenants had mental health issues and had repeatedly engaged in behavior that substantially disturbed the neighbors. *Id.* at 301-302.

The court affirmed a Housing Court decision awarding possession to the housing authority. In the process, the court observed that the term "qualified handicapped person" did not appear in either the State or Federal fair housing statutes, 42 U.S.C. § 3604(f)(2) and G. L. c. 151B, § 4(7A)(2). *Id.* at 310. The term did appear, however, in the Rehabilitation Act, 29 U.S.C. § 794, to which, in the court's view, the fair housing statutes were analogous. *Ibid.* For that reason, the court said, it saw

> "little reason not to consider whether a [tenant] is a 'qualified' handicapped person in the context of a housing discrimination claim 'because many of the issues that arise in the "qualified" analysis, also arise in the context of the "reasonable modifications" or "undue burden" analysis.' "

*Ibid.*, quoting from *Bercovitch* v. *Baldwin Sch., Inc.*, 133 F.3d 141, 154 (1st Cir. 1998).

Turning to definitions, the court said that "[i]n the public housing context, a 'qualified' handicapped individual is one who could meet the authority's eligibility requirements for occupancy and who could meet the conditions of a tenancy, with a reasonable accommodation or modification in the authority's rules, policies, practices, or services." *Ibid.* Quoting from *Garrity*, 421 Mass. at 63, the court also noted that "[a]n employee is not 'a "qualified handicapped person" within the meaning of G. L. c. 151B and therefore is not entitled to the protection of that statute' if he engages in conduct 'significantly inimical to the interests of his employer and in violation of the employer's rules.' " *Ibid.*

In the more recent *Mammone* case, the court explained its *Andover Hous. Authy.* decision in the following terms:

> "In *Andover Hous. Auth.* v. *Shkolnik,* 443 Mass. 300, 310 (2005), this court implied that *Garrity* is not confined to cases of alcoholism or substance dependency. In that case, we affirmed the dismissal of a housing discrimination counterclaim brought under G. L. c. 151B by elder residents of a public housing unit who were being evicted for various violations of the housing authority's rules and policies. None of these violations was a direct threat to the safety of the elder resident or other residents of the public housing complex. Assuming arguendo that one of the residents was handicapped — suffering from Alzheimer's dementia, depression, and a host of other mental and physical ailments — and that the housing violations stemmed from this handicap, the court turned to whether the resident met the definition of a qualified handicapped person. Citing *Garrity* for the proposition that an employee is not a qualified employee 'if he engages in conduct "significantly inimical to the interests of his employer and in violation of his employer's rules," ' *Andover Hous. Auth.* v. *Shkolnik, supra,* we reasoned that, '[i]n the public housing context, a "qualified" handicapped individual is one who could meet the authority's eligibility requirements for occupancy and who could meet the conditions of a tenancy, with a reasonable accommodation . . . .' *Id.* [at 310]."

*Mammone,* 446 Mass. at 674 n.33.

We think that the analysis of "qualified handicapped person" in *Andover Hous. Authy.* and in *Mammone* expresses the court's decision to utilize in the housing context a framework for determining "qualified handicapped persons" analogous to the framework it utilizes in the employment context. See *Peabody Properties, Inc.* v. *Sherman,* 418 Mass. at 607-608. There is no suggestion in the text or history of the governing statutes that the antidiscrimination provisions of the fair housing laws were designed to insulate individuals with handicaps from the consequences of activities that would be grounds for termination of tenants without handicaps. Moreover,

> "[t]he primary concern of public housing authorities is the safety of their tenants. . . . It follows that a public housing authority must have the discretion to seek to terminate a lease based on criminal activity . . . that constitutes a

threat to public safety. . . . Tenants of public housing developments . . . represent some of the most needy and vulnerable segments of our population, including low-income families, children, the elderly, and the handicapped. It should not be their fate, to the extent manifestly possible, to live in fear of their neighbors."

*Lowell Hous. Authy.* v. *Melendez,* 449 Mass. 34, 40 (2007). For that reason, the Federal and State fair housing statutes provide for eviction of tenants who engage in violent activity threatening "the health, safety, or right to peaceful enjoyment of the premises by other tenants." 42 U.S.C. § 1437d(l)(6) (2000). See G. L. c. 121B, § 32.

We therefore conclude that an individual who engages in conduct that violates a housing authority's rules and that is significantly inimical to an authority's obligation to provide a physically safe environment for its tenants is not a "qualified handicapped person" entitled to an authority's general obligation to provide reasonable accommodations for its handicapped tenants.

Under that standard, Bridgewaters was not a "qualified handicapped person." His violent assault on his brother left the latter with significant physical injuries. His conduct was a crime of which he had been found guilty, without contest. His conduct occurred on BHA property and in his brother's unit, not his own. And his conduct, arising, as the judge was entitled to believe it did, from a replay of childhood slights and insults, amounted to such a gross overreaction to trivialities that a reasonable housing administrator could view a recurrence of his violent outburst as a likely prospect.

We recognize that some decisions in other jurisdictions point in a different direction. See, e.g., *Roe* v. *Sugar River Mills Assocs.,* 820 F. Supp. 636, 639-640 (D.N.H. 1993); *Roe* v. *Housing Authy. of Boulder,* 909 F. Supp. 814, 821-823 (D. Colo. 1995). Those cases, however, did not involve individuals who had been convicted of criminal assaults against cotenants in authority property, and neither involved an approach to the definition of "qualified handicapped person" analogous to the definition adopted by our Supreme Judicial Court. We also recognize the impact that eviction may have on individuals who

may already be at society's margins, but loss of employment may likewise have a severe impact. However, nothing in the public housing laws "requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damages to the property of others." 42 U.S.C. § 3604(f)(9) (2000). A housing authority, in sum, is not required to accommodate the problems and difficulties of one tenant whose housing choices are limited at the expense of others laboring under similar constraints.

b. *Remaining issues.* In his second posttrial motion, Bridgewaters sought relief from judgment pursuant to Mass.R.Civ.P. 60(b)(1), contending that his failure to more fully develop at trial a defense based on reasonable accommodation amounted to excusable neglect and that the BHA's termination notice was defective. On appeal, he contends that the Housing Court judge abused his discretion when he denied that motion.[9] We disagree.

The judge analyzed the motion in a thoughtful and comprehensive manner, evaluating each of the factors set out in *Berube* v. *McKesson Wine & Spirits Co.*, 7 Mass. App. Ct. 426, 430-431 (1979).[10] Insofar as failure to develop a reasonable accommodation defense is concerned, the judge decided that although Bridgewaters satisfied the first *Berube* factor by promptly asserting a posttrial claim for relief, he satisfied none of the other five factors. The judge's conclusions were surely within the range of reason and evinced no abuse of discretion on his part.

Finally, Bridgewaters's claim that the termination notice was

---

[9]Rule 60(b)(1) provides: "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect."

[10]These factors are "(1) whether the offending party has acted promptly after entry of judgment to assert his claim for relief therefrom; (2) whether there is a showing either by way of affidavit, or otherwise apparent on the record, that the claim sought to be revived has merit; (3) whether the neglectful conduct occurs before trial, as opposed to during, or after the trial; (4) whether the neglect was the product of a consciously chosen course of conduct on the part of counsel; (5) whether prejudice has resulted to the other party; and (6) whether the error is chargeable to the party's legal representative, rather than to the party himself." *Berube* v. *McKesson Wine & Spirits Co.*, 7 Mass. App. Ct. at 430-431, quoting from *Barber* v. *Tuberville*, 218 F.2d 34, 36 (D.C. Cir. 1954).

defective is derived from a statement in the notice that the eviction was "effective immediately," as the lease and G. L. c. 139, § 19, permitted, despite the fact that Federal law, specifically 42 U.S.C. § 1437d(l)(4)(A) (2000), and 24 C.F.R. § 966.4(l)(3)(i)(B) (2007), gives a tenant a reasonable period of time, not to exceed thirty days, to vacate a unit. Because the issue was not raised before or during trial, or even in Bridgewaters's first posttrial motion, the motion judge, who had also been the trial judge, correctly ruled that the issue had been waived. See *New Bedford Hous. Authy.* v. *Olan*, 435 Mass. 364, 372 (2001). Moreover, Bridgewaters received the notice to quit on February 10, 2004, but the BHA did not commence the summary process action until March 22, 2004. Therefore, even if the notice were defective, Bridgewaters received the full benefit of the thirty-day notice to vacate period.

> *Judgment affirmed.*

> *Orders dated August 3, 2004, and September 20, 2005, denying postjudgment motions, affirmed.*