MASSACHUSETTS BAY TRANSPORTATION AUTHORITY vs.
MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION
& another.[1]

Suffolk. October 4, 2007. - January 4, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Massachusetts Bay Transportation Authority. Anti-Discrimination Law,* Employment, Religious beliefs. *Religion. Employment,* Discrimination.

A judge in the Superior Court correctly affirmed a determination of the Massachusetts Commission Against Discrimination that the plaintiff employer had discriminated against a prospective employee in violation of G. L. c. 151B, § 4 (1A), where the employer failed to demonstrate that any possible accommodation of the prospective employee's religious obligations would have constituted an undue hardship in the context of its operations, in that the employer failed to investigate the possibility of voluntary shift swaps to cover the prospective employee's weekly absences due to his need for time off to observe his Sabbath. [334-341]

Statement that requiring an employer to conduct an investigative or interactive process to determine whether accommodation of a prospective employee's religious obligations would be an undue hardship on the employer was not itself an undue hardship, but an employer's failure to engage in such an interactive process is not, in and of itself, a violation of G. L. c. 151B, § 4 (1A). [341-343]

After determining that an employer had discriminated against a prospective employee in violation of G. L. c. 151B, § 4 (1A), by failing reasonably to accommodate the prospective employee's religious obligations, the Massachusetts Commission Against Discrimination (commission) did not exceed its authority in ordering the employer to hire the prospective employee to the position for which he was qualified, where the commission reasonably could have concluded that the five-year litigation process sufficiently had investigated the extent of the prospective employee's religious obligations and the possible avenues of accommodation. [343-344]

CIVIL ACTION commenced in the Superior Court Department on January 20, 2004.

The case was heard by *Geraldine S. Hines,* J., on a motion for judgment on the pleadings.

[1]David Marquez.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Mark W. Batten* for the plaintiff.

*Gerald E. Katz* for David Marquez.

*Beverly I. Ward* for Massachusetts Commission Against Discrimination.

The following submitted briefs for amici curiae:

*Todd R. McFarland,* of Maryland, *Charles M. Kester,* of Arkansas, *& Charles J. Eusey* for General Conference of Seventh-Day Adventists.

*Rebecca Pontikes & Patricia A. Washienko* for Jewish Alliance for Law and Social Action & others.

*Douglas Taylor,* of Virginia, *& John F. McMahon* for Local 589 of the Amalgamated Transit Union.

*Mary T. Sullivan & Donald J. Siegel* for Massachusetts AFL-CIO.

CORDY, J. The Massachusetts Bay Transportation Authority (MBTA) appeals from a judgment of the Superior Court affirming a determination of the Massachusetts Commission Against Discrimination (MCAD) that the MBTA discriminated against a prospective employee, David Marquez, in violation of G. L. c. 151B, § 4 (1A).[2] More specifically, the MCAD determined that the MBTA failed reasonably to accommodate Marquez's religious obligations when it refused to hire him as a part-time bus driver due to his need for time off to observe his Sabbath (Friday at sundown until Saturday at sundown). The principal

---

[2]The statute provides, in relevant part:

> "It shall be unlawful discriminatory practice for an employer to impose upon an individual as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such individual to violate, or forego the practice of, his creed or religion as required by that creed or religion including but not limited to the observance of any particular day . . . as a sabbath or holy day and the employer shall make reasonable accommodation to the religious needs of such individual. No individual who has given notice . . . shall be required to remain at his place of employment during any day . . . that, as a requirement of his religion, he observes as his sabbath or other holy day, including a reasonable time prior and subsequent thereto for travel between his place of employment and his home . . . ." G. L. c. 151B, § 4 (1A).

basis for its determination was the failure of the MBTA to meet its statutory burden either to provide a reasonable accommodation for Marquez's sincerely held religious beliefs or to demonstrate that any accommodation that the MBTA could have made would have posed an "undue hardship" on its operations. This failure of proof, in turn, the MCAD concluded, was largely the product of the MBTA's failure to take any steps whatsoever to ascertain whether an accommodation was possible at the time, and evidence from MBTA employees suggesting the existence of a number of possibilities that went unexplored. We transferred the case to this court on our own motion.

In its appeal, the MBTA presents three grounds on which it claims that the MCAD decision should be reversed: (1) requiring the MBTA to give Marquez Friday evenings off would have posed an undue hardship pursuant to G. L. c. 151B, § 4 (1A), or, alternatively would violate the establishment clause of the First Amendment to the United States Constitution[3],[4]; (2) requiring the MBTA to engage Marquez in an interactive process for the purpose of identifying possible accommodation would likewise pose an undue hardship on the MBTA; and (3) the relief granted by the MCAD exceeded its authority. We affirm the

[3]General Laws c. 151B, § 4 (1A), requires employers to make reasonable accommodation to the sincerely held religious beliefs of employees. The statute defines "[r]easonable accommodation" as "such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business." The statute further provides examples of what will be considered undue hardship:

> "Undue hardship, as used herein, shall include the inability of an employer to provide services which are required by and in compliance with all federal and state laws, including regulations or tariffs promulgated or required by any regulatory agency having jurisdiction over such services or where the health or safety of the public would be unduly compromised by the absence of such employee or employees, or where the employee's presence is indispensable to the orderly transaction of business and his or her work cannot be performed by another employee of substantially similar qualifications during the period of absence, or where the employee's presence is needed to alleviate an emergency situation. The employer shall have the burden of proof to show undue hardship."

[4]The establishment clause of the First Amendment to the United States Constitution reads, "Congress shall make no law respecting an establishment of religion . . . ."

Superior Court judgment, but not on all the grounds relied on by the judge.[5]

1. *Facts.* The following material facts are not in dispute. Marquez is a practicing Seventh-Day Adventist, who serves as a deacon of his church in Cambridge. Consistent with the tenets of his religion, Marquez does not work on the Sabbath, which extends from sundown each Friday night to sundown each Saturday night. According to Marquez's beliefs, he could be in transit home after sunset on Friday. He could not, however, work after sunset. He spends each Friday evening at home with his family, sharing Sabbath dinner, and spends each Saturday at his church. Former employers accommodated his religious obligations by allowing him to work on Sunday.

In April, 1997, Marquez applied for a job with the MBTA. Throughout the application process, Marquez informed MBTA representatives that he was not able to work from sundown on Friday to sundown on Saturday. In May, Marquez passed a written examination to become a part-time streetcar operator, and on June 12, 1997, he was given a conditional offer of employment. That offer was contingent on the outcome of a criminal records check, a physical examination, and a drug screening test.

On August 7, 1997, while his background checks were ongoing, Marquez expressed an interest in applying for the position of part-time bus operator. The manager of human resources for the MBTA informed Marquez that he would need a commercial driver's license in order to become a bus operator. Shortly thereafter, Marquez obtained his commercial driver's license. By late August, 1997, he had passed the preliminary screening, testing, and interview process. His physical examination, drug screening, and criminal records check all were unproblematic, and he was cleared for hiring.

Marquez received his assignment to begin bus driver training on September 2, 1997. The training was scheduled to run from Tuesday through Saturday, which conflicted with Marquez's observation of the Sabbath. Marquez notified an MBTA human

[5]We acknowledge the amicus briefs of the Massachusetts AFL-CIO; Local Chapter 589 of the Amalgamated Transit Union; the Jewish Alliance for Law and Social Action, the National Employment Lawyers Association, and the National Lawyers Guild; and the General Council of Seventh-Day Adventists.

resources representative of the conflict, who told him that she would "look into the issue."

Other than that one Saturday of training, working on Saturdays did not present any problem, as part-time bus operators work Monday through Friday, for a morning rush hour shift and then an evening rush hour shift each day. Friday evenings, then, became the point of conflict between Marquez's Sabbath obligations and the requirements of his job.

In early September, 1997, the MBTA notified Marquez that it could not grant his request to refrain from working on Friday evenings because of his religious beliefs and, therefore, would not extend an offer of employment. The parties agree that but for Marquez's scheduling needs, he was qualified for the position of part-time bus operator. It is also undisputed that the MBTA never discussed with Marquez any possible accommodation.

In the wake of the MBTA's decision, Marquez suffered significant emotional distress. He felt that he was put in a position where he had to choose between his religion and his ability to work, and his choice made him question his faith. He took a hiatus from serving as a deacon in his church because he felt that he was an inadequate advocate for his religion. Marquez's relationship with his wife began to deteriorate, and he began to drink and smoke cigarettes, in violation of his religious obligations. Only after a period of one and one-half years was he able fully to reembrace his religion.

2. *Procedural history.* On September 9, 1997, Marquez filed a charge of discrimination against the MBTA with the MCAD. He alleged that the MBTA discriminated against him on the basis of his religion by refusing to accommodate his religious observance of the Sabbath, in violation of G. L. c. 151B, § 4 (1A). The MCAD found probable cause to credit Marquez's allegations and certified the case for a public hearing.

A commissioner conducted a hearing on August 1 and 2, 2001. There was testimony from the manager of the human resources department at the MBTA that in 1997 the MBTA did not have a written policy regarding religious accommodation, but that the standard operating procedure was to ask for documentation supporting the request (which Marquez had provided), and to consult the legal department, the hiring department, the equal employ-

ment opportunity department, and the human resources department of the MBTA about potential accommodations. This process of consultation would include weighing factors such as the position the applicant was seeking and the impact any accommodation would have on operational needs, all of which would yield "some tangible evidence or documentation to support [the MBTA's] decision." There was, however, no evidence of any kind, written or oral, offered by the MBTA to establish that it engaged in such a process in response to the request made by Marquez.

The MBTA's chief transportation officer of bus operations testified at the MCAD hearing regarding the MBTA's methods of covering for its many scheduled and unexpected employee absences. When there are insufficient drivers, he testified, the MBTA will use its "cover" list to fill in with relief drivers for any absent ones.[6] If possible, the MBTA will also facilitate voluntary swaps among drivers to limit preventable absences. Although there was at the time a policy forbidding full-time drivers from swapping with part-time drivers, it was a "loose[ly]" enforced policy, and approximately thirty full-time drivers (who would have worked out of the same garage as Marquez)[7] worked on Sundays and not on Fridays, and would have been in a position to swap shifts with Marquez if they chose to do so. There was also testimony that, if necessary, the MBTA would pay other operators overtime to cover for an unmanned route, or even leave the vacant shift uncovered. There was no evidence that any of these methods for covering employee absences was considered by the MBTA in response to Marquez's request for accommodation.

After the hearing, the commissioner issued a written decision, including detailed findings of fact and conclusions of law. The

---

[6]The MBTA "cover" list is comprised of drivers who are assigned "to the list" rather than to a regular route. Drivers assigned "to the list," called "relief" drivers, are assigned on a short-term basis to cover shifts left vacant by drivers who have scheduled or unexpected absences because of illness, jury duty, suspension, or vacation. The chief transportation officer testified that there was no "cover" list for part-time bus drivers in the fall of 1997 because of a worker shortage. The MCAD concluded that such a system for part-time drivers was insufficiently explored as a potential accommodation for Marquez.

[7]Drivers who worked out of the same garage would have been trained on and been familiar with all of the bus routes operated from that location.

commissioner found that there were a number of possible means by which Marquez's religious beliefs could have been accommodated, including coverage by relief drivers (over which management retained a measure of discretion), or through the use of overtime workers, or by leaving the Friday evening shift uncovered, or by allowing voluntary swaps between part-time and full-time drivers. Notwithstanding these possible accommodations, the MBTA offered no evidence to show that it explored any of them, but had concluded, without investigation, that an accommodation of Marquez's beliefs was not feasible. Consequently, the hearing commissioner found, the MBTA had "refused to even attempt a good faith effort to accommodate [Marquez]" and did not meet its burden of proving undue hardship pursuant to G. L. c. 151B, § 4 (1A). The commissioner awarded Marquez $50,000 for emotional distress and ordered the MBTA to hire Marquez for the position for which he was qualified in 1997, if Marquez still desired to pursue it.

The MBTA appealed from the commissioner's decision to the full commission. The MBTA did not contest that Marquez was qualified to be a part-time bus operator or the commissioner's finding that, despite a loose policy to the contrary, voluntary swaps between part-time bus operators and full-time operators happened frequently. Instead, the MBTA claimed that any accommodation that would have allowed Marquez to leave his bus route early every Friday evening would have caused undue hardship. Therefore, the MBTA contended, it did not need to engage Marquez in an interactive process to ascertain his religious obligations more fully and whether they could be reasonably accommodated. Indeed, the MBTA asserted that requiring such a process would itself be an undue hardship.

The full commission affirmed the commissioner's findings and order of relief, similarly concluding that the MBTA had not sufficiently demonstrated that accommodating Marquez's religious beliefs would cause it an undue hardship. The MCAD also went further, interpreting the reasonable accommodation language of G. L. c. 151B, § 4 (1A), to require that an employer engage in an interactive process with its employee once the employer is notified of an employee's conflicting religious obligation, and concluding that the MBTA's failure to engage in

such a process with Marquez was itself a separate violation of the statute. As the MCAD found, "the reasonable accommodation language . . . give[s] rise to a concomitant obligation on the part of an employer to engage in a meaningful dialogue with an employee in order to investigate fully whether a particular accommodation can be made." The MCAD affirmed the relief granted by the commissioner and awarded $53,550 in attorney's fees to Marquez.

Pursuant to G. L. c. 30A, § 14, the MBTA appealed from the MCAD's decision to the Superior Court. A Superior Court judge affirmed the decision of the MCAD, concluding that the MBTA had failed to demonstrate that the possibility of reasonably accommodating Marquez was foreclosed. Modes of accommodation, the judge observed, such as voluntary swaps and the use of relief drivers, may have been available to accommodate Marquez, and the MBTA failed to show that those options would have constituted an undue hardship. The judge noted that no MBTA official consulted with union officials regarding any possible accommodations (shift selections and swaps), and no employees were consulted regarding their willingness to swap shifts with Marquez. Additionally, the judge found that the payment of overtime to an employee to cover Marquez's Friday evening shift would not impose an undue hardship on the MBTA, but that requiring the MBTA to leave a shift uncovered as an accommodation to Marquez's schedule would impose such a hardship. The judge found ample evidence to support the MCAD's finding that the MBTA should have conducted an interactive individualized inquiry seeking to accommodate Marquez, and that such an inquiry is required unless a reasonable accommodation clearly is impossible, which was not the case here. Last, the judge found that the relief ordered by the MCAD, including the award of attorney's fees, was within the commission's discretion.

3. *Discussion.* We will affirm a decision and order of the MCAD unless its findings and conclusions are unsupported by substantial evidence or are based on error of law. See G. L. c. 151B, § 6; G. L. c. 30A, § 14 (7); *School Comm. of Brockton* v. *Massachusetts Comm'n Against Discrimination,* 423 Mass. 7, 11 (1996); *New York & Mass. Motor Serv., Inc.* v. *Mas-*

*sachusetts Comm'n Against Discrimination*, 401 Mass. 566, 572 (1988).

We begin by noting that the commissioner's findings (adopted by MCAD) that Marquez established a prima facie case of religious discrimination in violation of G. L. c. 151B, § 4 (1A),[8] and that the MBTA failed to take any steps to accommodate him or even to investigate whether any of a number of potential accommodations was possible without incurring undue hardship, are amply supported in the record.[9]

We now turn to the MBTA's two central assertions of error. First, the MBTA asserts that the MCAD's conclusion that it failed to prove that any possible accommodation would have been undue hardship was incorrect as a matter of law. Second, the MBTA asserts that any accommodation of Marquez would have imposed more than a de minimis cost on it in violation of the establishment clause.

In applying G. L. c. 151B, § 4 (1A), the MCAD and the Superior Court judge properly looked to the familiar three-part inquiry that is applied when religious discrimination is alleged. *New York & Mass. Motor Serv., Inc.* v. *Massachusetts Comm'n Against Discrimination, supra* at 575-576.[10] Initially, the employee bears the burden of proving that the employer required

---

[8]Under G. L. c. 151B, § 4 (1A), a complainant must demonstrate that an employer required an employee to violate a religious practice required by the employee's sincerely held belief as a condition of employment, and that the employee provided the employer with at least ten days' notice of the employee's scheduling needs. *New York & Mass. Motor Serv., Inc.* v. *Massachusetts Comm'n Against Discrimination*, 401 Mass. 566, 575-576 (1988); *Cloutier* v. *Costco Wholesale Corp.*, 390 F.3d 126, 138 (1st Cir. 2004), cert. denied, 545 U.S. 1131 (2005). As discussed at length, see part 3, *infra*, the burden then rests with the employer to demonstrate that the employee was reasonably accommodated, or that reasonable accommodation would have posed an undue hardship. See G. L. c. 151B, § 4 (1A); *New York & Mass. Motor Serv., Inc.* v. *Massachusetts Comm'n Against Discrimination, supra*; *Cloutier* v. *Costco Wholesale Corp., supra*.

[9]For example, when Marquez inquired through interrogatories whether the possibility of facilitating swaps between drivers had been explored, the MBTA flatly replied, "No," without further elaboration. Similarly, although the MBTA now contends that its managerial discretion on shift assignments and swaps was cabined by its collective bargaining agreement with the union, the MBTA answered, "No," when Marquez inquired whether the MBTA had consulted with the union regarding possible accommodation.

[10]This three-step analysis was set forth in *New York & Mass. Motor Serv.,*

him to violate a religious practice compelled by his sincerely held belief. *Id.* See *Cloutier* v. *Costco Wholesale Corp.*, 390 F.3d 126, 137 (1st Cir. 2004), cert. denied, 545 U.S. 1131 (2005) (applying same analysis in context of amended statute). The employee must also demonstrate that he provided his employer with the required advance notice of his religious obligation (ten days). G. L. c. 151B, § 4 (1A). Once the employee establishes these prerequisites, the burden shifts to the employer either to accommodate the complainant or "to prove that accommodation of the complainant's religious obligations would impose on the employer an undue hardship as defined by the statute." *New York & Mass. Motor Serv., Inc.* v. *Massachusetts Comm'n Against Discrimination*, *supra* at 576. In determining whether this burden has been met, the MCAD must focus on the particular nature and operations of the employer's business. *Id.* Additionally, the MCAD must inquire "whether the employer could have exercised its managerial discretion in such a way that the employee's religious obligations could have been reasonably accommodated." *Id.*

The burden here, then, is on the MBTA to demonstrate that any possible accommodation of Marquez's religious beliefs would have constituted an undue hardship in the context of its operations. An employer's mere contention that it could not reasonably accommodate an employee is insufficient, G. L. c. 151B, § 4 (1A); *New York & Mass. Motor Serv., Inc.* v. *Massachusetts Comm'n Against Discrimination*, *supra*, as is its mere speculation. See *Brown* v. *General Motors Corp.*, 601 F.2d 956, 960 (8th Cir. 1979) (under parallel protections of Title VII of Civil Rights Act of 1964, "employer stands on weak ground when advancing hypothetical hardships in a factual vacuum").

The statute offers four express examples of undue hardship.

*Inc.* v. *Massachusetts Comm'n Against Discrimination*, *supra* at 575-576, which was decided in 1988. The Massachusetts antidiscrimination statute was revised in 1997, in the wake of this court's holding in *Pielech* v. *Massasoit Greyhound, Inc.*, 423 Mass. 534 (1996), cert. denied, 520 U.S. 1131 (1977).

That revision changed the scope of those protected by G. L. c. 151B, § 4 (1A), but not the extent of the protection it afforded. Claims of religious discrimination by an employee continue to be evaluated under the same three-part inquiry. *Cloutier* v. *Costco Wholesale Corp.*, *supra.*

G. L. c. 151B, § 4 (1A). The term includes the "inability of an employer to provide services which are required by . . . federal and state laws." If the employee's absence would "unduly compromise[]" public health or safety, then accommodation is unreasonable. Similarly, an employer is not required to accommodate the absence of an irreplaceable employee "where [that] employee's presence is indispensable to the orderly transaction of business." Last, if the employee's presence is "needed to alleviate an emergency situation," his absence will be considered undue hardship. The list of examples is not exhaustive. *Cloutier* v. *Costco Wholesale Corp.*, *supra* at 138. Rather, it illustrates the types of accommodation that constitute excessive interference with an employer's business affairs under the statute. *Id.*

The term "undue hardship" is the same term used in Title VII of the Civil Rights Act of 1964 regarding Federal protections from religious discrimination. 42 U.S.C. §§ 2000e(j), 2000e-2(a)(1) (2006). The United States Supreme Court has interpreted the inclusion of the "undue hardship" provision in Title VII to mean that an employer may not be required to bear more than a de minimis cost to accommodate the religious beliefs of an employee. *Trans World Airlines, Inc.* v. *Hardison*, 432 U.S. 63, 84 (1977).[11] Although the Massachusetts undue hardship standard in G. L. c. 151B is "notably different" and allows for slightly broader religious protection, the two share substantial common ground. *Pielech* v. *Massasoit Greyhound, Inc.*, 441 Mass. 188, 196 (2004) (comparing scope of Title VII

---

[11]The United States Supreme Court did not hold that its reading of the undue hardship provision of Title VII in *Trans World Airlines, Inc.* v. *Hardison*, 432 U.S. 63, 84-85 (1977), was constitutionally required. Its holding was a matter of statutory interpretation. *Id.* at 85 ("In the absence of clear statutory language or legislative history to the contrary, we will not readily construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath"). See *Ansonia Bd. of Educ.* v. *Philbrook*, 479 U.S. 60, 67 (1986) (Court's statutory interpretation of Title VII in its *Hardison* decision).

The Court did, however, suggest that certain accommodations could run afoul of the establishment clause. For example, the Court held that "to require TWA to bear [more than de minimis] additional costs when no such costs are incurred to give other employees the days off that they want would involve unequal treatment of employees on the basis of their religion." *Trans World Airlines, Inc.* v. *Hardison*, *supra* at 84. The Court ultimately concluded that such disparate treatment was not what Title VII contemplated.

and G. L. c. 151B, § 4 [1A]). In that vein, we consider Federal case law construing Title VII in interpreting G. L. c. 151B, § 4 (1A). See, e.g., *Wheatley* v. *American Tel. & Tel. Co.*, 418 Mass. 394, 397 (1994) ("It is our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G. L. c. 151B").

With State and Federal precedents in mind, we agree with the Superior Court judge that the MBTA cannot be forced to accommodate Marquez by leaving his shift uncovered. That decision must be left to the MBTA, and the statute does not require otherwise. G. L. c. 151B, § 4 (1A) ("Undue hardship, as used herein, shall include . . . where the employee's presence is indispensable to the orderly transaction of business and his or her work cannot be performed by another employee of substantially similar qualifications during the period of absence"). We also agree with the MBTA that it need not accommodate Marquez by paying a replacement operator overtime to cover his shift each week, see *Trans World Airlines, Inc.* v. *Hardison, supra* at 84 (Title VII does not require employer to pay premium wages to cover for absent employee because that accommodation is unreasonable and constitutes undue burden), and that G. L. c. 151B, § 4 (1A), cannot be read to require employees to swap shifts involuntarily. See *id.* (Title VII does not so require). However, at the MCAD hearing, the MBTA failed to demonstrate that these were the only methods of accommodation available. We therefore turn to the question of voluntary shift swaps as a means of accommodation.

The MBTA now asserts that its voluntary swap policy could not have guaranteed Marquez a weekly accommodation, ultimately because that policy prevented part-time operators from swapping shifts with full-time operators. Yet, the evidence was that this policy was not official, and that such swaps were frequently allowed. As this court held in *New York & Mass. Motor Serv., Inc.* v. *Massachusetts Comm'n Against Discrimination, supra* at 578, an employer cannot meet its burden pursuant to G. L. c. 151B, § 4 (1A), by casting a selectively enforced swap policy as a roadblock to accommodation. In that case, the employer purported to enforce a one-man-off vacation policy, but the evidence was that the policy was applied selectively. *Id.*

at 571-572. When the employee requested time off to observe his holy days, the employer contended that such an accommodation was not possible, because of its seniority system and its one-man-off vacation policy. *Id.* at 578. This court concluded that because that policy was selectively enforced, the employer could have exercised its managerial discretion with de minimis cost and effort to accommodate the complainant. *Id.* at 578. Similarly, here the swap policy was "loose" and subject to frequent exception, and the MBTA failed to demonstrate that it could not have exercised its managerial discretion to allow Marquez to swap with full-time drivers without incurring more than de minimis cost. Moreover, where the MBTA failed even to explore this possible accommodation, its claim of undue hardship rests, unpersuasively, in a factual vacuum.[12]

In the absence of evidence demonstrating a contractual bar to voluntary employee swaps, or other interference with employer operations, requiring an employer to facilitate such swaps as a means of accommodating the religious observances of its employees will not be considered undue hardship. General Laws

---

[12]The MBTA attempts to distinguish *New York & Mass. Motor Serv., Inc.* v. *Massachusetts Comm'n Against Discrimination, supra* at 578, by contending that because MBTA employees are unionized, it lacks such managerial discretion.

The MBTA asserts that its collective bargaining agreement with Local 589 of the Amalgamated Transit Union (Local 589) established an inflexible seniority system for the assignment of shifts. The MBTA contends that this system, in turn, limited the MBTA's managerial discretion, which prevented it from being able to accommodate Marquez. Yet, as the amicus briefs of both Local 589 and the Massachusetts AFL-CIO point out, there were no seniority provisions in the collective bargaining agreement that would have prevented the MBTA from taking Marquez's Sabbath observance into account when scheduling in 1997. The record includes articles of agreement between Local 589 and the MBTA signed on March 27, 1997, which do not include seniority provisions. It also includes a memorandum of understanding between the parties, signed on March 10, 2000. That memorandum does address the details of selecting work by seniority, but it is unclear when the parties contractually agreed to that system. According to Local 589, the work selection language was unenforceable until specific implementation language was signed in March, 2001. Any confusion on this point is the product of the MBTA's failure to investigate possible accommodations pursuant to G. L. c. 151B, § 4 (1A). Had the MBTA consulted with union representatives in 1997, which it admittedly did not, the issue whether the collective bargaining agreement precluded various possible accommodations for Marquez likely would have been addressed and resolved.

c. 151B, § 4 (1A), clearly contemplates that employers will help employees shuffle shifts to allow observance of their Sabbath. Indeed, the only specific religious observance mentioned by the statute is the observance of the Sabbath, G. L. c. 151B, § 4 (1A),[13] and voluntary shifts swaps are one of the most straightforward, and least costly, ways to ensure compliance with the statute's requirements. See *Beadle* v. *Hillsborough County Sheriff's Dep't*, 29 F.3d 589, 593 (11th Cir. 1994), cert. denied, 514 U.S. 1128 (1995) (employer reasonably accommodated employee under Title VII by providing him with employee roster sheet that included all coworkers' schedules, and allowing him to advertise his need for shift swaps during daily roll calls and on department bulletin board). While it is possible, as the MBTA contends, that voluntary swap arrangements covering Marquez's shift every Friday evening were unlikely, had the MBTA actually investigated the possibility, its assertions would carry substantially more weight. *Brown* v. *General Motors Corp.*, 601 F.2d 956, 961 (8th Cir. 1979). The MBTA's blanket assertion that Marquez's demand for relief from the Friday evening shift were unreasonable is an insufficient substitute for that investigation. The MBTA failed to prove that the use of voluntary swaps to accommodate Marquez would impose an undue burden on its operations.[14]

Because the MBTA failed to present evidence that it took any steps to accommodate, or even to investigate possible accommodations for Marquez, we need not address its claim that requiring an employer to incur more than de minimis cost to accommodate an employee violates the establishment clause. See

---

[13]The statute provides, in relevant part: "It shall be unlawful . . . for an employer to impose upon an individual as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such individual to violate, or forego the practice of, his creed or religion . . . including but not limited to *the observance of any particular day or days or any portion thereof as a sabbath or holy day . . .*" (emphasis added).

[14]Pursuant to G. L. c. 151B, § 4 (1A), like under Title VII, an employee's absolute refusal to work on the Sabbath, without more, does not preclude accommodation. *EEOC* v. *Ithaca Indus.*, 849 F.2d 116, 118 (4th. Cir), cert. denied, 488 U.S. 924 (1988) (Title VII "clearly anticipates that some employees will absolutely refuse to work on their Sabbath and that this firmly held religious belief requires some offer of accommodation by employers").

*New York & Mass. Motor Serv., Inc.* v. *Massachusetts Comm'n Against Discrimination, supra* at 577-579 (when employer has not demonstrated de minimis cost, this court need not consider whether imposition of more significant cost would violate establishment clause).[15]

Finally, the MBTA contends that requiring either an investigative or interactive process in this case would itself be an undue hardship. Such a reading of G. L. c. 151B, § 4 (1A), would eviscerate religious protection in the workplace. If merely looking into an accommodation, or consulting with an employee about his requested accommodation, were to be considered too great an interference with an employer's business conduct, then employers would effectively be relieved of all obligation under G. L. c. 151B, § 4 (1A). General Laws c. 151B, § 9, mandates that "[t]his chapter shall be construed liberally for the accomplishment of its purposes . . . ." To read the statute as the MBTA urges would eviscerate this statutory objective.

We do not agree with the MCAD, however, that an employer's failure to engage in the interactive process is, in and of itself, a violation of G. L. c. 151B, § 4 (1A), irrespective of whether a reasonable accommodation is possible.[16] Although the MCAD generally has the primary responsibility to determine the scope

[15]The MBTA relies heavily on *Trans World Airlines, Inc.* v. *Hardison,* 432 U.S. 63, 84-85 (1977), in arguing that it cannot be obligated to incur more than a de minimis cost in accommodating Marquez. It is instructive to compare the accommodations attempted by the employer in that case with the lack of effort by the MBTA in the present one. *Id.* at 77. There, Trans World Airlines held several meetings with the employee in which it attempted to find a solution to the employee's problems. *Id.* The airline authorized a union steward to search for an employee who would swap shifts. *Id.* Finally, the airline attempted, without success, to find the employee another job with the company that would not conflict with his religious obligations. *Id.* The Supreme Court, therefore, held that Trans World Airlines had done "all that could reasonably be expected" within the bounds of its collective bargaining agreement. *Id.* The MBTA, by contrast, failed to demonstrate that it took any steps even to attempt to accommodate Marquez's religious obligations. As the hearing commissioner found, it is clear that the MBTA "refused to even attempt a good faith effort . . . or to assist [Marquez] in achieving his accommodation." That is plainly insufficient under G. L. c. 151B, § 4 (1A), as it would be under its Federal counterpart. See, e.g., *EEOC* v. *Arlington Transit Mix, Inc.,* 957 F.2d 219, 222 (6th Cir. 1991) (employer had obligation under Title VII to investigate voluntary shift swap before terminating employee).

[16]The MCAD drew an analogy to handicap discrimination cases, which do

of G. L. c. 151B, § 4 (1A), we note that the plain language of the statute requires only "reasonable accommodation." G. L. c. 151B, § 4 (1A). See *Stonehill College* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass. 549, 563, 576 (2004) (noting court's general deference to MCAD in determining scope of G. L. c. 151B, but also holding that commission's presumption of emotional distress damages in retaliation firings was improper). If an employer can demonstrate, for example, that a certain accommodation imposes an undue hardship, it would not be reasonable to require an interactive process each time that accommodation is sought.

We therefore do not require an interactive process without exception. There is no obligation to undertake an interactive process if an employer can conclusively demonstrate that all conceivable accommodations would impose an undue hardship on the course of its business. See *Weber* v. *Roadway Express, Inc.*, 199 F.3d 270, 275 (5th Cir. 2000); *EEOC* v. *Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988), cert. denied, 489 U.S. 1077 (1989) (employer is not required to engage in fruitless dialogue if it is absolutely clear no accommodation could be made without undue hardship). Such a demonstration, however, will often be difficult to make without the employer's having engaged in an interactive process with the employee and having made a good faith effort to explore the options that come out of such a process. The MBTA has amply demonstrated this point in the case before us.

For this reason, we have encouraged an interactive process in other settings under G. L. c. 151B, even where we have declined to interpret a specific provision to make it mandatory.[17] For

---

require an employer to engage in the interactive process once an employee requests an accommodation, to require that same obligation in religious accommodation cases. See, e.g., *Ocean Spray Cranberries, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 648-649 (2004); MCAD Guidelines: Employment Discrimination on the Basis of Handicap § VII.B (1998) ("Once an employer is on notice that a qualified handicapped employee requires accommodation to perform the essential functions of his/her job, the employer should initiate an informal interactive process with the qualified individual in need of accommodation. This process should identify the precise limitation resulting from the handicap and potential reasonable accommodations that could overcome those limitations").

[17]When a qualified handicapped employee requests accommodation pursu-

example, in the housing context (where landlords are required to make reasonable accommodations for handicapped tenants), we have not required landlords to engage in an interactive process in order to determine what a reasonable accommodation might be, *Andover Hous. Auth.* v. *Shkolnik*, 443 Mass. 300, 308 (2005),[18] but have encouraged landlords to do so because "such a process is the optimal way for a landlord and tenant to explore the scope of the tenant's alleged handicap as well as the availability and feasibility of various accommodations." *Id.* at 308-309. That process is also the optimal way for an employer to meet its burden reasonably to accommodate the sincerely held beliefs of an employee or, alternatively, to show that the employee cannot be accommodated without undue hardship.

4. *Relief.* The MBTA contends that the MCAD exceeded its discretion by ordering the MBTA to hire Marquez to the position for which he was qualified in 1997, and was required to limit its relief in this regard to requiring the MBTA to investigate whether an accommodation at the present time was possible without imposing an undue burden on its operations. We disagree.

When the MCAD finds an unlawful practice, it may "take such affirmative action, including but not limited to, *hiring*, reinstatement or upgrading of employees . . . as, in the judgment of the [MCAD], will effectuate the purposes of [G. L. c. 151B]" (emphasis added). G. L. c. 151B, § 5. See *New York*

---

ant to G. L. c. 151B, § 4 (16), we have concluded that his employer is obligated to participate in the interactive process of determining one. *Ocean Spray Cranberries, Inc.* v. *Massachusetts Comm'n Against Discrimination, supra* at 648-649; *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 457 (2002). With respect to handicap discrimination in the workplace, the MCAD guidelines provide that, once notified of an employee's handicap, the employer "should" engage in an interactive process to determine the "precise limitation resulting from the handicap" and "potential reasonable accommodations that could overcome those limitations." MCAD Guidelines: Employment Discrimination on the Basis of Handicap § VII.B (1998). "The guidelines represent the MCAD's interpretation of G. L. c. 151B, and are entitled to substantial deference, even though they do not carry the force of law." *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 239 (2001). The MCAD regulation addressing employment discrimination on the basis of religion do not include reference to an interactive process. 804 Code Mass. Regs. § 3.01(7) (1995).

[18]The MCAD regulation on housing accommodation for handicapped individuals does not reference an interactive process. 804 Code Mass. Regs. § 2.03 (1993).

& *Mass. Motor Serv., Inc.* v. *Massachusetts Comm'n Against Discrimination, supra* at 581-582 n.14 (formulation of damage awards under G. L. c. 151B, § 5, is within MCAD's discretion). Cf. *Stonehill College* v. *Massachusetts Comm'n Against Discrimination, supra* at 570-576 (discussing MCAD's broad remedial powers, but holding that when those powers are used to award emotional damages, damages must be proved rather than assumed). MCAD decisions are subject to review pursuant to the standards set forth in G. L. c. 30A, § 14 (7), and thus cannot be arbitrary, capricious, or against the weight of the evidence. The MCAD reasonably concluded that, five years after the alleged discrimination, the appropriate remedy was requiring the MBTA to hire Marquez rather than simply engage in an interactive and investigative process in an attempt to accommodate him. The MCAD may have logically concluded that the five-year litigation process sufficiently investigated the extent of Marquez's religious obligations, and the possible avenues of accommodation.

5. *Conclusion.* In sum, we affirm the judgment of the Superior Court affirming the MCAD's findings of fact and the relief granted. While the MCAD erred when it concluded that the MBTA had violated G. L. c. 151B, § 4 (1A), by not engaging in an interactive process when Marquez sought a religious accommodation, the Superior Court judge correctly concluded that the MBTA made an insufficient showing of undue hardship.

*Judgment affirmed.*