## BOSTON HOUSING AUTHORITY *vs.* EMMITT BRIDGEWATERS.

Suffolk. October 6, 2008. - January 7, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Boston Housing Authority. Housing. Landlord and Tenant,* Handicapped person. *Anti-Discrimination Law,* Handicap, Housing. *Words,* "Direct threat," "Reasonable accommodation."

Discussion of the "direct threat" exception to a public housing authority's ordinary obligation to accommodate tenants with disabilities, which is incorporated both in the Federal regulatory scheme that governs federally assisted public housing authorities such as the Boston Housing Authority (BHA) and in the BHA's own policies, and which requires that before a public housing authority may terminate the lease of a disabled tenant on the grounds that the tenant poses a significant risk to the health or safety of others that cannot be eliminated by a reasonable accommodation, the housing authority must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk. [838-844]

In a summary process action brought by a public housing authority (authority) to terminate the lease of a disabled tenant who had assaulted another tenant, the authority had an obligation to assess individually whether the tenant posed a significant risk to the health or safety of others that could not be eliminated by a reasonable accommodation, where the authority had knowledge prior to trial that the tenant was disabled and where, at trial, the tenant raised his disability and apprised the judge of his need for an accommodation [844-848]; further, the authority's failure to follow its policy regarding reasonable accommodation foreclosed it from denying that a causal link existed between the tenant's disability and the assault [848-849]; therefore, this court vacated the judgment of possession in favor of the authority and remanded the matter for further proceedings before the Housing Court [849-851].

SUMMARY PROCESS. Complaint filed in the Boston Division of the Housing Court Department on March 22, 2004.

The case was heard by *Steven D. Pierce*, J., and posttrial motions were heard by him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Ann Jochnick* (*Richard M.W. Bauer & James M. McCreight* with her) for the defendant.

*Jay S. Koplove* for the plaintiff.

The following submitted briefs for amici curiae:

*Thomas P. Murphy* for Disability Law Center & others.

*Paul R. Collier, III, & Esme Caramello* for Massachusetts Coalition for the Homeless & others.

*Susan Ann Silverstein & Michael Schuster* for AARP.

*Susan C. Cohen & Lisa L. Walker* for Cambridge Housing Authority & another.

*Amy Copperman & Judith Liben* for Massachusetts Union of Public Housing Tenants.

MARSHALL, C.J. This is an appeal by Emmitt Bridgewaters from a judgment of the Boston Division of the Housing Court Department awarding possession of his apartment to the Boston Housing Authority (BHA), and denying Bridgewaters's postjudgment motions to alter or amend the judgment and for relief from the judgment. A judge in the Housing Court concluded that Bridgewaters had violated a provision of his lease by "committing a crime on the public housing development grounds that threatened the health and safety of another resident." Bridgewaters appealed, and the Appeals Court affirmed. *Boston Hous. Auth.* v. *Bridgewaters*, 69 Mass. App. Ct. 757, 768 (2007). We granted his application for further appellate review limited to his claim for a reasonable accommodation.

Bridgewaters has a mental disability. Central to this appeal is his assertion that the BHA failed to explore the feasibility of a reasonable accommodation of his disability before concluding that continuation of his tenancy would constitute a threat to the safety of other tenants. See 42 U.S.C. § 3604(f)(9) (2000).[1] Bridgewaters also asserts that the judge erred in concluding that he failed at trial to raise a request for a reasonable accommodation.[2]

Before a public housing authority may conclude that a dis-

---

[1] Boston Housing Authority (BHA), as a recipient of Federal funds, is governed by the Fair Housing Amendments Act. 42 U.S.C. §§ 3601 et seq. (2000).

[2] Bridgewaters also asserts claims under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (2000); the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (2000); the Massachusetts Antidiscrimination Law, G. L.

abled tenant poses "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services," 24 C.F.R. § 9.131(b) (2008), the authority "must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk." 24 C.F.R. § 9.131(c) (2008). We conclude that, in this case, the public housing authority was on notice prior to trial that Bridgewaters was disabled. We further conclude that, at trial, Bridgewaters raised both his disability and a request for a reasonable accommodation. In these circumstances, the failure of the BHA to make the individualized assessment described above before concluding that Bridgewaters posed a threat to others was error. We vacate the judgment of the Housing Court and remand the case for further proceedings consistent with this opinion.[3]

1. *Procedural background.* On March 22, 2004, the BHA brought an eviction action against Bridgewaters by filing a summary process complaint in the Housing Court. The BHA claimed that Bridgewaters had caused serious physical harm to another tenant, his twin brother. Trial commenced and was concluded on April 22, 2004. On May 17, 2004, the judge issued written findings of fact and conclusions of law, and entered judgment for possession for the BHA.

Bridgewaters, now represented by counsel, moved for reconsideration and for relief from judgment pursuant to Mass. R. Civ. P. 59, 365 Mass. 827 (1974), and Mass. R. Civ. P. 60 (b),

c. 151B, § 4; and art. 114 of the Amendments to the Massachusetts Constitution. In light of our holding, we need not address these claims, which may, if appropriate, be addressed on remand.

[3] We acknowledge the amicus briefs submitted in support of Bridgewaters by the AARP; Disability Law Center, Mental Health Legal Advisors Committee, Center for Public Representation, and Coalition for the Legal Rights of People with Disabilities; Massachusetts Coalition for the Homeless, The Pine Street Inn, Massachusetts Housing and Shelter Alliance, and Boston Center for Independent Living; and Massachusetts Union of Public Housing Tenants. We acknowledge the amicus brief submitted in support of the BHA by the Cambridge Housing Authority and Housing and Development Law Institute.

365 Mass. 828 (1974). The judge treated the motion as one under rule 59, and denied it, concluding that a reasonable accommodation request had not been raised at trial, and that, because Bridgewaters "took [a] guilty plea to violent activity, no reasonable accommodation [would] be required," citing *Peabody Props., Inc.* v. *Sherman*, 418 Mass. 603 (1994).

Bridgewaters filed a notice of appeal, together with motions to waive the appeal bond and costs, and to stay execution pending appeal. One week later, he moved in the Housing Court for relief from the judgment under rule 60 (b). After a hearing, the judge denied the motion.

Bridgewaters appealed to a single justice of the Appeals Court for a stay of execution pending appeal. The stay was granted, subject to Bridgewaters's continued treatment for his disability and compliance with the terms of his lease with the BHA. The Appeals Court then affirmed the judgment and the Housing Court judge's orders denying the postjudgment motions, concluding that "an individual who engages in conduct that violates a housing authority's rules and that is significantly inimical to an authority's obligation to provide a physically safe environment for its tenants is not a 'qualified handicapped person' entitled to an authority's general obligation to provide reasonable accommodations for its handicapped tenants," and that, "[u]nder that standard," Bridgewaters was not a qualified handicapped person. *Boston Hous. Auth.* v. *Bridgewaters, supra* at 768.

2. *Factual background.* We summarize the facts found by the judge, supplemented by undisputed facts of record and uncontested affidavits and exhibits considered by the judge in Bridgewaters's posttrial motions. The BHA owns and operates Holgate Apartments, a federally assisted residential complex for the elderly and the disabled, where Bridgewaters resides. His twin brother, Eric, also resided at Holgate, in a different apartment. In the late evening of January 9 or the early morning of January 10, 2004, Bridgewaters assaulted Eric, inside Eric's apartment. As a result of the altercation, Eric, who was paralyzed on the left side of his body due to a stroke he suffered as a child, sustained severe injuries and temporary paralysis in his right leg.[4] After the as-

---

[4]Bridgewaters pleaded guilty to three charges related to the incident: assault and battery, assault and battery on a disabled person, and assault and battery

sault, the BHA brought this action; the BHA had not previously attempted to terminate Bridgewaters's tenancy.[5]

During the trial, Bridgewaters, who was not represented by counsel, testified that he had not initiated the assault, that he had punched his brother once, and that had thrown water at him. Bridgewaters also testified that he suffers from a mental disability, which he termed manic depression or bipolar disorder. He stated that he had been prescribed medication, but that he was unmedicated at the time of the assault on the advice of his physician. Bridgewaters also testified that, after the altercation, he had received treatment for his disability and is "in a better situation today" than he was at the time of the assault. The BHA offered no evidence to refute Bridgewaters's testimony about his course of medication or his treatment for disability. The BHA, however, did state that it would not reevaluate its decision to evict Bridgewaters: counsel asserted that the BHA was "not interested in preserving this tenancy" and was "not interested in any sort of mediation [because] of the severity of the crime."

In support of his posttrial motion, Bridgewaters submitted affidavits and exhibits that elaborated on his trial testimony.[6] These materials indicate that Bridgewaters had been determined to be disabled by the Social Security Administration and unable to support himself, and that he was diagnosed with bipolar disorder and borderline personality disorder.[7] At the time of the assault, his medication had been suspended because it caused negative side effects, and he had recently transitioned from his therapist of five years to a new therapist. The only treatment he was receiving for his disabilities at the time of the assault was a weekly psychotherapy session. The documents further disclosed

by means of a dangerous weapon. He received suspended sentences and probation.

[5]Bridgewaters submitted an affidavit with his posttrial motion stating that the BHA "has been my landlord since I was one year old." At the time Bridgewaters signed his affidavit in 2004, he was thirty-nine years old.

[6]We recite uncontested facts raised after trial because they are relevant to this appeal.

[7]A social worker stated in a posttrial affidavit that these medical conditions cause Bridgewaters to experience symptoms such as "impulsivity, suicidal ideation, instability of affect as manifested by manic and depressive episodes, mood reactivity, and transient stress-related paranoia."

that, after the assault, Bridgewaters was hospitalized as an in-patient in a mental health facility for three weeks, from which he was discharged to the community after his caregivers deter-mined that he was safe to return with adequate support. Finally, the documents disclosed that Bridgewaters was under the care of a physician and a social worker. Both submitted letters stat-ing that Bridgewaters was determined to control his mental ill-ness and that he was receiving appropriate medication and treat-ment to stabilize his condition. Bridgewaters also submitted a letter from his brother, Eric, stating that the brothers had reconciled.

We reserve for later discussion facts related to whether the judge should have considered Bridgewaters's disability-based defense at trial.

3. *Discussion.* Because the issue whether Bridgewaters made a reasonable accommodation request arises meaningfully only if the BHA is obligated to entertain his request, we first address whether Bridgewaters's misconduct foreclosed consideration of any reasonable accommodation request.

a. *The "direct threat" exception.* Much of this case turns on what is known as the "direct threat" exception to a public hous-ing authority's ordinary obligation to accommodate tenants with disabilities. See 42 U.S.C. § 3604(f)(9) (2000).[8] The exception is incorporated in both the Federal regulatory scheme that gov-erns federally assisted public housing authorities, such as the BHA, and in the BHA's own policies. We begin with the Federal scheme, which is expressed in both the Fair Housing Amend-ments Act (FHAA), 42 U.S.C. §§ 3601 et seq. (2000), and regulations promulgated by the Department of Housing and Urban Development (HUD), 24 C.F.R. Part 9 (2008).[9,10]

In 1988, Congress enacted the FHAA, making it unlawful to

_____

[8]Title 42 U.S.C. § 3604(f)(9) (2000) (the direct threat exception) of the Fair Housing Amendments Act provides: "Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or physical safety of other individuals or whose tenancy would result in substantial physical damage to the property of others."

[9]Part 9 of 24 C.F.R. "applies to all programs or activities conducted by the [Department of Housing and Urban Development (HUD)], except for programs or activities conducted outside the United States that do not involve individu-als with disabilities in the United States." 24 C.F.R. § 9.102 (2008).

[10]For a more extensive history of the direct threat exception, see Note, The

"discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter." 42 U.S.C. § 3604(f)(1).[11] To address concerns that passage of the FHAA would prevent landlords from evicting handicapped tenants who posed a threat to others, the House Judiciary Committee Report[12] explains that a handicapped tenant would not qualify for protection if "he or she would pose a threat to the safety of others, unless such threat can be eliminated by reasonable accommodation." H.R. Rep. No. 100-711, 28 (1988), 1988 U.S. Code Cong. & Admin. News 2173, 2189. See note 15, *infra.* The House rejected a more sweeping provision than the one referenced in the House Report, which would have excluded "a category of individuals with disabilities from the [antidiscrimination] protections of the [FHAA]." H.R. Rep. No. 100-711, *supra.*

HUD subsequently promulgated regulations[13] establishing procedures for public housing authorities to follow in order to determine whether a disabled tenant poses a direct threat to others, such that a reasonable accommodation is not warranted.[14] These

FHAA's Reasonable Accommodation & Direct Threat Provisions as Applied to Disabled Individuals Who Become Disruptive, Abusive, or Destructive in Their Housing Authority, 36 Ind. L. Rev. 759, 762-767 (2003).

[11]Pursuant to 42 U.S.C. § 3603, federally assisted public housing authorities such as the BHA are governed by the antidiscrimination prohibitions of 42 U.S.C. § 3604(f). Title 42 U.S.C. § 3604(f)(3) provides, in pertinent part:

> "[D]iscrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped person] equal opportunity to use and enjoy a dwelling."

[12]"No Senate Report was submitted with this legislation." 1988 U.S. Code Cong. & Admin. News 2173.

[13]The United States Department of Housing and Urban Development (HUD) is empowered to "promulgate such regulations as may be necessary" to ensure that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794 (2000).

[14]The BHA's reasonable accommodation policy, which was incorporated into Bridgewaters's lease, states that the BHA will follow "guidelines and guidance issued by the U.S. Department of Housing and Urban Development."

procedures mandate that, after a disabled tenant requests a reasonable accommodation and prior to terminating a lease, federally assisted housing authorities such as the BHA must conduct an individualized, fact-specific, and objective inquiry into whether an accommodation can mitigate the risk to other tenants. HUD defines "[d]irect threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services." 24 C.F.R. § 9.131(b). Furthermore, where a disabled tenant has requested a reasonable accommodation, HUD regulations provide:

> "In determining whether an individual poses a direct threat to the health or safety of others, the agency *must* make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk" (emphasis added).

24 C.F.R. § 9.131(c).[15] Cf. *Chevron U.S.A. Inc.* v. *Echazabal,* 536 U.S. 73, 86 (2002).

---

[15]This language follows closely a passage in *School Bd. of Nassau County* v. *Arline,* 480 U.S. 273 (1987), on which the House Judiciary Committee drew in drafting the FHAA. 1988 U.S.C.C.A.N. 2173, 2189. See *School Bd. of Nassau County* v. *Arline, supra* at 287, 288. See also *United States* v. *California Mobile Home Park Mgt. Co.,* 29 F.3d 1413, 1416 (9th Cir. 1994) ("the FHAA imposes an affirmative duty upon landlords to accommodate the needs of handicapped persons").

The BHA relies on *Southeastern Community College* v. *Davis,* 442 U.S. 397, 406 (1979) (*Davis*), to assert that disabled tenants are not qualified for a reasonable accommodation unless they are "able to meet all of a program's requirements in spite of handicaps." This reliance is misplaced. *Alexander* v. *Choate,* 469 U.S. 287, 299 n.19 (1985) (*Alexander*), clarified the holding in *Davis* by stating that "the question of who is 'otherwise qualified' and what actions constitute 'discrimination' under [§ 504 of the Rehabilitation Act of 1973] would seem to be two sides of a single coin; the ultimate question is the extent to which a grantee is required to make reasonable modifications in its programs for the needs of the handicapped." See *Wynne* v. *Tufts Univ. Sch. of Med.,* 932 F.2d 19, 27 (1st Cir. 1991) (holding "the literal language of *Davis* that an 'otherwise qualified person' must meet 'all of a program's requirements,' " was modified by *Alexander,* which "in effect modified the

The directive of 24 C.F.R. § 9.131 to consider objectively and specifically whether a reasonable accommodation will sufficiently mitigate the risk posed by the continued tenancy of a disabled person is not optional. In drafting § 9.131, HUD stated in response to public comments that "[t]his new section provides that the agency *must* determine whether reasonable modifications of its policies, practices or procedures will mitigate the risk posed by the individual determined to present a direct threat to the health or safety of others" (emphasis added). 59 Fed. Reg. 31,036, 31,041 (1994).[16]

Thus, § 9.131 does not prevent a public housing authority from evicting a disabled tenant where the landlord can demonstrate that no accommodation is available that would protect the health or safety of other tenants. It does not require automatic accommodation of tenants who would harm other residents. It does, however, require a public housing authority to assess individually whether, given a proposed request for a reasonable accommodation, a disabled tenant poses a direct threat to the health or safety of others.[17]

---

'all' language of *Davis* and articulated the obligation to make reasonable accommodation part of the 'otherwise qualified' inquiry").

[16] A joint statement of HUD and the United States Department of Justice (DOJ), entitled Reasonable Accommodations Under the Fair Housing Act (May 17, 2004) (joint statement) provides: "A determination that an individual poses a direct threat *must* rely on an individualized assessment that is based on reliable objective evidence (e.g., current conduct, or a recent history of overt acts). The assessment *must* consider (1) the nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable accommodations that will eliminate the direct threat." (Emphases added.) See note 17, *infra*.

[17] This conclusion is consistent with HUD and DOJ guidance for public housing authorities, which the BHA's lease obligates it to follow. In their joint statement, HUD and DOJ addressed certain specific questions, including "How can a housing provider determine if an individual poses a direct threat?" The response provided recited the individualized assessment set out in 24 C.F.R. § 9.131(c) and noted that, "in evaluating a recent history of overt acts, a provider *must* take into account *whether the individual has received intervening treatment or medication that has eliminated the direct threat (i.e., a significant risk of substantial harm).* In such a situation, the provider may request that the individual document how the circumstances have changed so that he no longer poses a direct threat. . . . The housing provider must have reliable, objective evidence that a person with a disability poses a direct threat before excluding him from housing on that basis." (Emphasis added.)

The BHA's assertion that, "if the 'altercation' was an isolated incident, it is

Accordingly, before a federally assisted public housing authority such as the BHA may lawfully evict a disabled tenant who requests a reasonable accommodation as posing a threat to others, it must either demonstrate the failure of an accommodation instituted at the request of the tenant, or demonstrate that no reasonable accommodation will acceptably minimize the risk the tenant poses to other residents. See *Roe* v. *Housing Auth. of Boulder*, 909 F. Supp. 814, 822-823 (D. Colo. 1995) ("assuming Roe is handicapped or disabled, before he may lawfully be evicted [the housing authority] must demonstrate that no 'reasonable accommodation' will eliminate or acceptably minimize any risk Roe poses to other residents"); *Roe* v. *Sugar River Mills Assocs.*, 820 F. Supp. 636, 640 (D.N.H. 1993) ("assuming plaintiff is handicapped, the Act requires defendants to demonstrate that no 'reasonable accommodation' will eliminate or acceptably minimize the risk he poses to other residents before they may lawfully evict him"); *Arnold Murray Constr.* v. *Hicks*, 621 N.W.2d 171, 175, 176 (S.D. 2001) (eviction affirmed where court held landlord had "established that no reasonable accommodation would curb the threat [the tenant] poses," and concluding that when "landlord shows that no reasonable accommodation will curtail the risk, its duty to accommodate ceases").

Cornwell & Taylor LLP *vs.* Moore, Minnesota Court of Appeals, No. C8-00-1000 (Dec. 22, 2000), is instructive. In that case, a landlord subject to the requirements of the FHAA attempted to evict a tenant with schizoaffective disorder and bipolar disorder. After the tenant stopped taking his medication, he entered a delusional state, hit and choked his wife, and then took a loaded

---

likely unrelated to [Bridgewaters's] underlying disorders" and that this "is not a disability case at all" ignores its own policies, which provide an avenue for accommodation for isolated incidents by requiring public housing authorities to take into account intervening treatment. As the joint statement recognizes, when ongoing mental illness is controlled by successful treatment, the symptoms of that illness when not medicated may appear as an isolated incident.

In an example provided in the joint statement of HUD and DOJ, a tenant who threatens a neighbor with a baseball bat because a psychiatric disability causes him to become violent when he stops taking his medication is not foreclosed from accommodation. The example states that, after a tenant requests a reasonable accommodation, the landlord would need to grant the accommodation if the tenant can provide assurance that the tenant will receive appropriate counselling and periodic medication monitoring.

rifle to a public park, where he was arrested. Subsequent to his arrest, the tenant received treatment as an inpatient at a psychiatric facility, and received new medication that reduced his symptoms. His landlord nevertheless commenced eviction proceedings. The tenant stated that medication could control his condition as it had in the past, and requested a reasonable accommodation. The court concluded that once a reasonable accommodation had been requested, "the burden is on the landlord" to "demonstrate that no reasonable accommodation will eliminate or acceptably minimize any risk" that tenant "imposes on other residents." See *West Orange* v. *Whitman*, 8 F. Supp. 2d 408, 428 (D.N.J. 1998) (describing 42 U.S.C. § 3604[f][9] direct threat exception as "an affirmative defense available to landlords").

Echoing the Federal regulatory framework, the BHA's reasonable accommodation in housing policy and procedures (reasonable accommodation policy) also prohibits it from summarily concluding, after a reasonable accommodation request has been raised and before an individualized assessment of a disabled tenant has been conducted, that no accommodation will sufficiently reduce the risk of harm. The reasonable accommodation policy provides, among other things, that a conclusion that a disabled tenant poses a direct threat to others "should be founded on a history of actions by an applicant or resident, provided that there have not been changes in the meantime which make it likely that such actions would not recur. Also, if a reasonable accommodation could eliminate or sufficiently reduce the risk to health or safety, that accommodation must be provided." The reasonable accommodation policy also acknowledges that the BHA bears the burden of showing that no accommodation is reasonable: "if it can be shown that no reasonable accommodation is possible to lessen the risk of harm, then no accommodation is necessary." Where not contradicted by the FHAA and HUD regulations, the BHA is bound by its own procedures. *Morton* v. *Ruiz*, 415 U.S. 199, 235 (1974).

In short, the FHAA, HUD regulations, and the BHA's own policies make clear that the BHA cannot satisfy its requirement to explore reasonable accommodation for a disabled tenant who has committed an act of violence by summarily concluding, as the BHA's counsel stated to the judge, "[F]rankly your Honor

we're not interested in preserving this tenancy." The FHAA, HUD regulations, and the BHA's own policies demand a more stringent inquiry.

We turn now to the merits.

b. *Reasonable accommodation request.* Because the BHA's obligation to assess individually whether Bridgewaters posed a threat to the health or safety of others turns on whether Bridgewaters requested a reasonable accommodation, we now address whether the BHA knew that Bridgewaters was disabled and whether he made a request for a reasonable accommodation, leaving for later discussion the BHA's claim that no causal link existed between Bridgewaters's disability and the assault on his brother.

As a predicate to obtaining a reasonable accommodation in federally financed public housing, a disabled tenant must, if his landlord is not already aware, inform the landlord that he has a disability and must request some accommodation. Cf. *Reed* v. *LePage Bakeries, Inc.*, 244 F.3d 254, 260 (1st Cir. 2001) (employee must make employer "sufficiently aware that she had a disability . . . and consequently needed some sort of *special* accommodation" [emphasis in original]). We have held that, if a tenant informs a "landlord that the tenant is a qualified handicapped person, and that the tenant is currently being denied an equal opportunity to use and enjoy a dwelling," the tenant has requested an accommodation. *Andover Hous. Auth.* v. *Shkolnik*, 443 Mass. 300, 313 (2005). The BHA argues that Bridgewaters did not raise his disability or request a reasonable accommodation at trial. It also claims that there is no evidence that Bridgewaters is disabled, and that it was unaware that Bridgewaters was disabled.

We reject the BHA's assertion that Bridgewaters is not disabled under State and Federal disability law. Bridgewaters receives Federal disability benefits, which evidences that the Social Security Administration has determined that he has "an inability to engage in any substantial gainful activity" by reason of his physical or mental impairment because "he is not only unable to do his previous work but cannot engage in any other kind of substantial gainful work." 42 U.S.C. § 423(d) (2000). HUD regulations define an individual with a handicap as "any person who

has a physical or mental impairment that substantially limits one or more major life activities." 24 C.F.R. § 8.3 (2008). "Working" is one of several "[m]ajor life activities." *Id.* See Wiesner *vs.* 321 W. 16th St. Assocs., U.S. Dist. Ct., No. 00-Civ.-1423 (RWS) (S.D.N.Y. Aug. 22, 2000) ("[tenant], who suffers from a psychological illness and is entitled to Social Security Disability Income payments, is deemed to be a disabled individual within the meaning of the Fair Housing Act"). A 2004 joint statement of HUD and the United States Department of Justice (joint statement), see note 16, *supra,* informs that "[p]ersons who meet the definition of disability for purposes of receiving . . . Social Security Disability Insurance . . . benefits in most cases meet the definition of disability under the Fair Housing Act."

We also reject the BHA's assertion that it did not know that Bridgewaters was a disabled person who might require a special accommodation. Several weeks before trial, the Housing Court referred Bridgewaters to the Boston Tenancy Preservation Project (TPP), a "cooperative effort" between the Housing Court and private nonprofit agencies that assists tenants "whose mental illness . . . may be jeopardizing their tenancies." Annual Report on the State of the Massachusetts Court System, Fiscal Year 2003, at 16 (Feb. 14, 2004). Before trial TPP contacted the BHA regarding Bridgewaters. Even if the BHA was "not interested" in mediation, as its counsel stated at trial,[18] it certainly was on notice that it was dealing with a tenant with a mental disability. In addition, the BHA must have been aware that Bridgewaters was the recipient of Social Security disability benefits because it was annually required to recertify Bridgewaters's income. The BHA also screened Bridgewaters for tenancy eligibility in an apartment complex that the BHA itself represents as "designated as housing for elderly and disabled persons." Bridgewaters is not elderly; he was thirty-nine years old at the time of the assault. Taken together, these facts were more than sufficient to put the BHA on notice of Bridgewaters's disability.

Although the BHA was on notice that Bridgewaters was dis-

---

[18]At trial, when Bridgewaters confronted the BHA's counsel with the Boston Tenancy Preservation Project (TPP) referral form, the BHA's counsel responded: "I did receive a call from TPP . . . a couple of weeks ago and I said that I wasn't interested in any sort of mediation because of the severity of the crime . . . ."

abled, when it commenced eviction proceedings against him it did not apprise Bridgewaters of his rights as a disabled tenant. On February 10, 2004, the BHA served Bridgewaters with a notice of termination that did not include his right to request a reasonable accommodation or provide instructions on how to make such a request, as required by the lease and the BHA's policies.[19]

Even though Bridgewaters had not been fully apprised of his disability-related rights, at trial Bridgewaters did make the judge aware of his disability, testifying about his mental disability, the cessation in treatment at the time of the assault on his brother, and his subsequent treatment program. Bridgewaters did dispute that he had assaulted his brother, but he also argued: "I take full responsibility to a certain degree for my actions. . . . I was not on my medication." He was explicit about his mental disability ("I have a disability in which I suffer from bipolar and I'm manic depressive") and testified that the assault occurred after his doctor suspended his medication due to negative side effects ("[A]t the time [my doctor] did not have me on my medication. I was taking [Depakote] but I was taken off of it"), and that he was currently receiving effective treatment ("[B]ut I can honestly say that I am in a better situation today than what I was on the [day of the assault]. . . . I'm taking Topamax, I'm taking Seroquel"). The judge acknowledged Bridgewaters's testimony

---

[19]The lease between Bridgewaters and the BHA provides that "Resident and BHA hereby agree to abide by the terms of BHA's Reasonable Accommodation in Housing [Policy and] Procedures [reasonable accommodation policy], as it may then exist (and which is incorporated herein by reference)." The reasonable accommodation policy requires that "[a]ll documents sent by the BHA regarding action on a lease violation shall identify the lease violation and inform the resident of his/her right to request reasonable accommodation if necessary to comply with the lease." The reasonable accommodation policy in turn provides:

> "Where a resident faces eviction proceedings because of a lease violation(s) and the lease violation(s) is related to a disability, he or she shall be advised by management of the right to request reasonable accommodation. Both the *Notice of Private Conference* and *Notice of Termination/Notice to Quit* sent to residents shall set forth the basis for the proposed lease termination, and shall state that if the resident or a household member has a disability, he or she has the right to request reasonable accommodation to enable compliance with the lease on forms available at the development management office."

on this point,[20] but his decision made no reference to it.[21]

At trial, Bridgewaters also fulfilled the second requirement of a reasonable accommodation request by apprising the judge of his need for an accommodation. By opposing his eviction, asking to remain in his apartment, and stating that he was being successfully treated for his disabilities, Bridgewaters indicated that the relief he sought was that the BHA depart from its policy of evicting tenants for engaging in a violent act,[22] and reinstate his tenancy. Combined with Bridgewaters's assertions at trial that he was mentally disabled and had been successfully treated following the assault, this amounted to a request for an accommodation.[23]

To make a reasonable accommodation request, no "magic"

---

[20]For example, during Bridgewaters's closing argument, the following colloquy occurred:

THE JUDGE: "I understand you're getting treatment . . ."

BRIDGEWATERS: "Right!"

THE JUDGE: "For the problems that you have."

BRIDGEWATERS: "Right!"

[21]Pointing to Bridgewaters's trial testimony that he acted in self-defense or that his actions were necessary to avoid physical injury, the BHA argues that this is a "fatal flaw" in Bridgewaters's claim for reasonable accommodation. We disagree. Bridgewaters was not precluded from arguing both that the assault occurred because his doctor had taken him off the medication that treated his bipolar disorder and that his actions were not as alleged by BHA. These are not inconsistent defenses.

[22]Bridgewaters's lease is consistent with Federal policy that "any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants . . . shall be cause for termination of tenancy." 42 U.S.C. § 1437d(1)(6) (2000). The BHA must depart from this policy in order to comply with the FHAA. 24 C.F.R. § 966.4(1)(5)(vii)(F) (2008) ("eviction actions must be consistent with fair housing and equal opportunity provisions").

[23]In denying Bridgewaters's posttrial motions in which he argued that he was entitled to a reasonable accommodation from application of the BHA's rules and policies because of his mental disability, the judge noted: "[i]ssue not raised at trial or before; even if it were, *Peabody Properties, Inc.* v. *Sherman*[, 418 Mass. 603 (1994),] controls." For the reasons described, we disagree with the trial judge on this point. See *post* at 849, discussing *Peabody Props., Inc.* v. *Sherman, supra.* We also disagree with the Appeals Court that the reasonable accommodation issues "were not the subject of trial testimony or other evidence of the type that is always necessary if abstract claims are to become fact-based contentions that the court can resolve." *Boston Hous. Auth.* v. *Bridgewaters,* 69 Mass. App. Ct. 757, 764 (2007).

words are required. The joint statement resolved that, under the FHAA:

> "[A disabled resident or an applicant for housing] makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability . . . . *An individual making a reasonable accommodation request does not need to mention the Act or use the words 'reasonable accommodation.'* However, the requester must make the request in a manner that a reasonable person could understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability." (Emphasis added.)

Cf. *Taylor* v. *Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999) (where employee became psychotic at work due to her bipolar condition, and employer knew she had been hospitalized for three weeks for her condition, employer was on notice that employee had disability, and it was only necessary that employer be informed that employee needed accommodation); 5 Emp. Coordinator § 9:55, at 9-66 (West 2008) ("The employee need not use the phrase 'reasonable accommodation,' or make the request in writing. It is enough that the employee communicate the need in plain English that he or she has a disability and wants assistance for it"). Bridgewaters's request to remain in his apartment should have set in motion the fact-specific, objective inquiry we have outlined above.

c. *The nexus requirement.* Under the FHAA, a refusal reasonably to accommodate a disabled tenant is discriminatory when "such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). In other words, a reasonable accommodation is required where there is a causal link between the disability for which the accommodation is requested and the misconduct that is the subject of the eviction or other challenged action. The BHA claims that Bridgewaters has not established a nexus or causal link between his disability and the assault on his brother.

Although the relationship between Bridgewaters's disabilities and his acts is clearly implicit in his repeated assertions at trial

that he was not on any medication at the time, the BHA is correct that Bridgewaters did not expressly establish a causal link between his mental disability and the violent assault on his brother that occurred when he was not medicated. This does not end the inquiry. The BHA's reasonable accommodation policy provides that "[u]nless the BHA can identify specific reasons for doing otherwise, the BHA should accept . . . that the accommodation is related to disability." That policy also provides that "[u]nder no circumstances shall the BHA deny a request for reasonable accommodation based on a lack of sufficient information without first informing the applicant of its need for additional information." The BHA has not identified specific reasons for refusing to accept that the accommodation is related to Bridgewaters's disability,[24] nor has it requested additional information about Bridgewaters's disability. The reasonable accommodation policy, incorporated into Bridgewaters's lease with the BHA, and the BHA's failure to follow that policy foreclose it from denying that there is a causal link between Bridgewaters's disability and his acts that triggered the eviction proceedings.

The case *Peabody Props., Inc.* v. *Sherman*, 418 Mass. 603 (1994) (*Sherman*), on which the BHA relies, does not compel a different result. In that case a tenant was engaged in illegal drug activity when proceedings to terminate his lease were commenced. Illegal drug activity in which a tenant is engaged is the FHAA's sole exclusion from the definition of handicap. 42 U.S.C. § 3602(h) ("[the term 'handicap'] does not include current, illegal use of or addiction to a controlled substance"). This case does not involve illegal drug activity. Moreover, in *Sherman*, the offending conduct was ongoing and "current." *Id.* at 606-607. Here, Bridgewaters established, and the BHA does not challenge, that his violent conduct was limited to one serious assault that occurred after his doctor had directed him to suspend his medication for his bipolar disorder. The direct threat exception and attendant regulations apply directly to circumstances such as these.[25]

4. *Conclusion.* Bridgewaters's twin brother has the right to be

---

[24]See note 17, *supra.*

[25]In light of our conclusion that BHA did not comply with Federal law,

safe and secure in his home, as do all tenants of public housing. We do not minimize the severity of the attack on him. However, the law mandates that, before a public housing authority may terminate the lease of a disabled tenant such as Bridgewaters because he poses "a significant risk to the health or safety of others" that cannot be eliminated by a reasonable accommodation, 24 C.F.R. § 9.131(b), the housing authority "must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk," 24 C.F.R. § 9.131(c).[26] No

HUD regulations, and its own lease, we need not address whether the eviction of Bridgewaters is consistent with Massachusetts antidiscrimination statutes. See note 2, *supra.* In reaching a different result, the Appeals Court relied on two employment cases applying the "egregious workplace misconduct" doctrine. *Boston Hous. Auth.* v. *Bridgewaters*, 69 Mass. App. Ct. 757, 765 (2007). See *Mammone* v. *President & Fellows of Harvard College*, 446 Mass. 657, 670 (2006) ("employee who has committed egregious workplace misconduct . . . has precluded himself from 'performing the essential functions of the position,' with or without a reasonable accommodation"); *Garrity* v. *United Airlines, Inc.*, 421 Mass. 55, 63 (1995) ("a handicapped employee who engages in conduct significantly inimical to the interests of his employer and in violation of the employer's rules is not an 'otherwise qualified' person within the meaning of the Rehabilitation Act. We conclude that such a person is not a 'qualified handicapped person' within the meaning of G. L. c. 151B and therefore is not entitled to the protection of that statute"). The Appeals Court reasoned that the analysis of "qualified handicapped person" in *Andover Hous. Auth.* v. *Shkolnik*, 443 Mass. 300 (2005), and in *Mammone* v. *President & Fellows of Harvard College*, *supra*, expressed this court's "decision to utilize in the housing context a framework for determining 'qualified handicapped person' analogous to the framework it utilizes in the employment context." *Boston Hous. Auth.* v. *Bridgewaters, supra* at 767.

While it may be appropriate under Federal law to merge employment discrimination and fair housing doctrines where Congress explicitly drew on *School Bd. of Nassau County* v. *Arline*, 480 U.S. 273 (1987), an employment discrimination case, in drafting the FHAA, see note 15, *supra*, we see no reason to import the "egregious workplace misconduct" doctrine of employment cases into cases of housing discrimination where the Massachusetts statutes concerning "handicapped persons" differ in the two contexts, and where the Federal regulatory framework in the housing context has so clearly laid out the path to be followed.

[26]The United States Supreme Court has held that an accommodation is not reasonable if it imposes "undue financial and administrative burdens," *South-*

such individualized assessment has taken place in this case as it must. We vacate the judgment and remand the case to the Housing Court for further proceedings consistent with this opinion.

*So ordered.*

---

*eastern Community College* v. *Davis*, 442 U.S. 397, 412 (1979), or requires " 'changes,' 'adjustments,' or 'modifications' to existing programs that would be 'substantial,' or that would constitute 'fundamental alteration[s] in the nature of . . . program[s],' rather than to those changes that would be reasonable accommodations." *Alexander* v. *Choate*, 469 U.S. 287, 300 n.20 (1985), quoting *Davis*, *supra* at 410, 411 n.10 & 413.

The accommodation Bridgewaters seeks does not unduly burden the BHA. Bridgewaters does not suggest, as the BHA asserts, that the BHA should "monitor his treatment." On the contrary, the accommodation he requests is rooted in lease compliance, and relies on improved treatment monitored by Bridgewaters's doctors, who assert that the treatment they now provide can control his condition. Far from constituting a fundamental alteration to the BHA's program, such an accommodation would be, as described in its reasonable accommodation policy, "in furtherance of the BHA's goal of providing affordable housing to low income persons regardless of disability."

The BHA relies on *Department of Hous. & Urban Dev.* v. *Rucker*, 535 U.S. 125 (2002), and *Peabody Props., Inc.* v. *Sherman*, 418 Mass. 603 (1994), to assert that the accommodation Bridgewaters seeks is unreasonable. Those cases are inapposite as both concerned tenants who were involved in illegal drug activity at the time of lease termination. As noted, such illegal activity is expressly excepted from the FHAA's antidiscrimination provisions. 42 U.S.C. § 3602(h).